**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Paul F. FULK, Defendant-Appellant.**

**No. 85–2841.**

United States Court of Appeals,
Seventh Circuit.

Argued Oct. 24, 1986.

Decided April 16, 1987.

Rehearing Denied May 8, 1987.

Eric James Barr, Crist & Barr, Middletown, Ohio, for defendant-appellant.

Vilija A. Bilaisis, Asst. U.S. Atty., Anton R. Valukas, U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Before WOOD, and POSNER, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

ESCHBACH, Senior Circuit Judge.

After a jury trial, Paul F. Fulk was convicted of two counts of causing the transportation in interstate commerce of securities, i.e. checks, of a value of $5,000 or more, knowing them to have been obtained by fraud, in violation of 18 U.S.C. § 2314 (1982).[1]  On appeal, he challenges: (1) The

---

1.  18 U.S.C. § 2314 provides, in pertinent part:
    Whoever transports in interstate or foreign commerce any goods, wares, merchandise, securities or money of the value of $5,000 or

more, knowing the same to have been stolen, converted or taken by fraud ...

admission of his ex-wife's testimony over his assertion of the marital communications privilege; (2) The refusal of the trial court to grant a mistrial as a result of the government's allegedly improper impeachment questioning; and (3) The sufficiency of the evidence.[2] We find his contentions to be without merit; therefore, we affirm.

## I.

In January of 1980, the defendant approached several investors in an attempt to interest them in investing in a project to develop a fuel-efficient carburetor which he had been working on since the early 1970's. He had previously dealt with the investors, when they purchased silver from him several years earlier when he was an agent for Constitution Mint. He managed to convince Barbara and Warren Swanson, Robert and Dorothy Hood, and Wayne Benson to purchase stock in Par Industries, a corporation which had been formed to develop the carburetor. The Hoods sent Fulk $15,000; the Swansons gave him $25,000; and Benson gave him $2,000. All of these amounts were either cashier's checks or personal checks.

The transaction was structured so that the investors would purchase shares that had already been issued in Fulk's name for $1,000 per share. A "subscription agreement" was executed acknowledging that the investment was "speculative," that the corporation had "no physical assets," and that the "book value per share of common stock" was "zero." The agreement had a standard integration clause which provided:

> This subscription contains the entire contract between subscriber and the corporation. No agent or representative of the corporation or any other person has any power to change or alter the terms of this subscription, and no information or representation not contained herein should be relied upon as having been authorized by the corporation.

Tr. 57.

At the same time, Fulk executed a repurchase agreement which purported to obligate him, at the investors' option, to repurchase the shares at the end of one year.[3]

In order to persuade the investors, he represented to them that the carburetor was near completion and that he needed more money to finish research and development on it. He represented to them that he had an offer for the purchase of the patent on the carburetor from NAPA for $124 million. He also represented that he had retained an eminent scientist named Wrigley, who had been one of the inventors of the atomic bomb, to help him complete the project. All of the investors believed that the money that they invested was to be used solely for the purposes of research and development on the carburetor.

However, the corporation had not conducted any business as a corporation since 1977, when its board determined that no further shares should be issued or transferred until Fulk accounted for funds which had been received from previous investors, who then constituted a majority of the board. He was unable to make an accounting to the satisfaction of the Board because some of the funds had been spent on his personal expenses. At a board meeting, Fulk took the position that since the stock which those investors had purchased had (like that involved in the present case) been held by him individually, he was free to do what he wanted with the purchase proceeds. It had been the understanding of

---

Shall be fined not more than $10,000 or imprisoned not more than ten years, or both....

**2.** In his brief, Fulk also contended that the refusal of the trial court to instruct the jury on the meaning of reasonable doubt was reversible error. At oral argument, Fulk's counsel candidly conceded that this argument was foreclosed by ample precedent within this circuit. *E.g., United States v. Marquardt,* 786 F.2d 771, 784 (7th Cir.1986) (collecting cases); *see also* Federal

Criminal Jury Instructions of the Seventh Circuit 2.07.

**3.** Throughout the trial, the United States repeatedly emphasized that none of the repurchase agreements bore the names or signatures of the investors. This, according to the government, tended to show two things: (1) the lack of sophistication on the part of the investors; and (2) Fulk's intent not to honor the agreements.

the Board that he was obligated to make those funds available for corporate purposes, perhaps in the form of a loan.[4] The following year, Fulk tried to have some stock transferred, but was refused by the board because of the earlier problems.

Few, if any, of the funds received from the Swansons, the Hoods, and Benson were used for research and development of the carburetor. Some of the funds were deposited into the checking account of the chiropractic clinic operated by Fulk and his wife. No shares were ever transferred to the investors, apparently because the board of the corporation again refused to transfer shares as a result of the earlier unaccounted-for funds. When the investors inquired about the shares, Fulk said that there had to be a meeting of directors for the transfers to be effected. He later told the investors that the reason the meeting had not yet occurred was that the shareholders were all over the country and that it would take some time to assemble them.

In the Spring of 1980, the Hoods and Swansons went to see Fulk in Ohio to ascertain what progress was being made on the carburetor and on the share transfers. Before the meeting, Fulk told his wife to conceal the fact that they had separated. When she asked him about their visit, he told her that he did not plan to sell them any stock in the carburetor. He finally admitted to her that he did plan such a sale, but did not tell her that he had already received money for the shares.

The investors invoked the buyback agreement when it became apparent that they were not going to receive any shares, apparently after they spoke to Fulk's wife and to the directors of the corporation. Eventually Fulk stopped responding to their telephone calls and inquiries.

At trial, Fulk's ex-wife testified to the conversations that she and Fulk had prior to the investors' visit. Although he did not offer a contemporaneous objection, he had earlier made an oral motion *in limine* to prevent introduction of this testimony as a

violation of the marital communications privilege. The motion was denied by the trial court on authority of *Trammel v. United States*, 445 U.S. 40, 100 S.Ct. 906, 63 L.Ed.2d 186 (1980), which the court apparently believed held that only the testifying spouse could invoke the privilege.

Fulk testified in his own defense. On cross-examination, the prosecutor asked him if he had ever been accused of any misrepresentation. After he responded in the negative, the prosecutor attempted to impeach him with questions about the suspension of his chiropractor's license for false, deceptive and misleading advertising and for misrepresentations to individuals. The trial court sustained Fulk's objection to the question and immediately told the jury to disregard it. Fulk moved for a mistrial, and the motion was denied. At the close of the evidence, the court told the jury that the remarks of counsel were not evidence, and that they were not to consider any evidence to which he had sustained an objection.

## II.

We turn first to Fulk's contention that the admission of his ex-wife's testimony violated the marital communications privilege. We agree that it did not, although our reasons for so holding are substantially different from those given by the trial court. Specifically, we do not believe that the rule announced in *Trammel v. United States*, 445 U.S. 40, 100 S.Ct. 906, 63 L.Ed.2d 186 (1980), has any application to the case before us since that case involved the "adverse testimonial privilege" and this case involves the "marital communications privilege." Nonetheless, we conclude that the testimony was properly admitted, even under the latter privilege, because Fulk and his wife were permanently separated at the time of the allegedly confidential communications.

■ In *Trammel*, the question presented was "whether an accused may invoke the

---

4. Even had Fulk loaned the proceeds to the corporation, the original investors' acquiescence in this arrangement is amazing, since, as a creditor, Fulk's financial interest would have been senior to theirs as shareholders even though he had not put any money into the corporation.

privilege against adverse spousal testimony so as to exclude the voluntary testimony of his wife." *Id.* at 41–42, 100 S.Ct. at 908. After examining the original justification for the privilege, i.e., the notions that (a) an accused was not competent to testify due to his interest in the case and (b) the husband and wife were one, the Court concluded that "The ancient foundations for so sweeping a privilege have long since disappeared." *Id.* at 52, 100 S.Ct. at 913. Additionally, the Court found that "The contemporary justification for ... such a privilege is also unpersuasive. When one spouse is willing to testify against the other in a criminal proceeding ... there is probably little in the way of marital harmony for the privilege to preserve." *Id.* Thus, the court held that only the testifying spouse could invoke the privilege. *Id.* at 53, 100 S.Ct. at 914. However, the court was careful to limit its holding to the adverse testimony privilege, noting that "The privilege as to confidential marital communications is not at issue in the instant case; accordingly, our holding today does not disturb *Wolfe* [*v. United States*, 291 U.S. 7, 54 S.Ct. 279, 78 L.Ed. 617 (1934)] and *Blau* [*v. United States*, 340 U.S. 332, 71 S.Ct. 301, 95 L.Ed. 306 (1951)]." Although judicial confusion about the two privileges is indeed prevalent, they are distinct. See 8 Wigmore, Evidence § 2334 (McNaughten Rev.1961). The *Trammel* rule applies only to the adverse testimony privilege, *not* the marital communications privilege. *United States v. Byrd,* 750 F.2d 585, 592 (7th Cir. 1984). Thus, the trial court's reliance on *Trammel* to allow the testimony of Fulk's ex-wife was incorrect.

■ However, this does not mean that the admission of the testimony was error. This court has previously held that "proof of permanent separated status at the time of the communications between the defendant and the defendant's spouse renders the communications privilege automatically inapplicable." *Byrd,* 750 F.2d at 594. There is no dispute here that Fulk and his wife were permanently separated at the time of the allegedly privileged communications. Thus, this case is squarely controlled by *Byrd.* Fulk argues that, because his wife

initially cooperated with him, there was still hope of salvaging the marriage. However, the *Byrd* court declined to involve the courts in such a difficult factual inquiry by refusing to adopt a "deteriorating marriage" standard or to premise its decision on the notion that a separation only renders the privilege presumptively inapplicable. Instead, the court adopted a "categorical" rule. *Id.* Fulk has given us no persuasive reason to either reconsider or distinguish *Byrd* (which he did not even cite until his reply brief), and we can think of none. Although the district court's reasons for allowing Fulk's ex-wife to testify may have been wrong, the result was right. Therefore, we will not reverse on this ground. *See Pfeil v. Rogers,* 757 F.2d 850, 866 (7th Cir.1985).

### III.

■ We next consider whether the district court properly refused to grant Fulk's motion for a mistrial following the government's questioning of Fulk about the suspension of his license. Because an immediate curative instruction was given, we conclude that the district court was well within its discretion in denying the motion. Furthermore, while we agree that the United States Attorney's question regarding whether Fulk had been "accused" of any misrepresentations was improper, *see United States v. Kirk,* 496 F.2d 947 (8th Cir. 1974), we doubt that the specific question regarding his license revocation was likewise improper.

■ " 'The decision to grant a mistrial is within the broad discretion of the trial judge and is to be made in view of all the circumstances of the case.' " *United States v. D'Antonio,* 801 F.2d 979, 983 (7th Cir.1986) (quoting *United States v. Allen,* 797 F.2d 1395, 1400 (7th Cir.1986)). We do not believe that discretion was abused here in light of the fact that the district court *sustained* Fulk's objection, and immediately issued a cautionary instruction. As the government correctly states, it must be assumed that the jury performed its duty. *United States v. Phillips,* 640 F.2d 87, 91

(7th Cir.), *cert. denied*, 451 U.S. 991, 101 S.Ct. 2331, 68 L.Ed.2d 851 (1981). Any error was cured by the instruction.[5]

██ The questioning regarding the suspension of Fulk's chiropractor's license, although excluded by the district court, was not improper. The government was attempting to impeach his credibility with evidence that his license had been suspended for deceptive practices. Fed.R.Ev. 608(b) specifically allows for this:

> Specific instances of the conduct of a witness, for the purpose of attacking or supporting his credibility, other than conviction of crime as provided in rule 609, may not be proved by extrinsic evidence. *They may, however*, in the discretion of the court, if probative of truthfulness or untruthfulness, *be inquired into on cross-examination of the witness* (1) concerning his character for truthfulness or untruthfulness ...

(emphasis added).

A defendant takes the risk of such impeachment when he takes the stand. The fact that he was charged with a crime involving dishonesty may make his decision to take the stand seem particularly ill-advised, but it does not provide him with a basis for overturning his conviction.

## IV.

Finally, we reject Fulk's contentions that the evidence was insufficient to support the verdict and that the instructions to the jury were deficient. As we have noted before, an appellant who challenges the sufficiency of the evidence to sustain a jury verdict of conviction bears a heavy burden. *See United States v. Reynolds*, 801 F.2d 952, 954 (7th Cir.1986) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (evidence reviewed in light most favorable to government and verdict sustained if *"any* rational trier of fact could have found guilt beyond a reasonable doubt")).

██ Fulk does not dispute that the checks were securities or that he caused them to be transported in interstate commerce; thus the only issue was whether they were obtained by fraud and whether Fulk knew they were. At the very least the jury was entitled to infer that Fulk obtained the checks of the investors with the representation that he intended to and could have stock transferred to them, but that he was well aware that no such transfer could be effected because of a cloud over his prior dealings with investors in the corporation. Additionally, there was evidence of the representations made about the NAPA offer and the work of Wrigley, and that those representations were false. The fact that Fulk testified that the representations were not made and even that some of the victims did not recall the representations does not mean the government's case was insufficient. The jury was entitled to and apparently did believe otherwise. Finally, the use to which Fulk put the funds raised and his evasiveness when the investors asked about the venture all point to the fact that Fulk had no intention of using the funds raised to help bring the carburetor to market, nor any intention of honoring his committment under the buy-back agreement. The evidence was certainly sufficient to support the verdict.

Fulk's theory that he was merely selling his own personal stock, and thus could do as he wished with the proceeds, fares no better before this court than it did before the district court and the jury. Fulk would have us believe that all the investors understood that they were merely giving him money for his own stock, which was worth nothing, in the hope that he would allow the corporation to use some of the proceeds

---

**5.** In light of our view of the case we need not consider whether the "harmless beyond a reasonable doubt" standard of *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1968) or the less stringent standard of *Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946) (affirmance unless substantial and injurious effect) applies to the improper question whether Fulk had been "accused" of misrepresentation. We would affirm under either standard. We note, however, that the former generally only applies to errors of constitutional magnitude. *United States ex rel. Miller v. Greer*, 789 F.2d 438, 444 (7th Cir.1986) (en banc).

so that it, and ultimately all of its shareholders, could benefit. The jury was certainly entitled to reject such a contention. While in many ways this case provides a textbook example of how *not* to invest one's money, the fact that the victims were less than careful, perhaps blinded by the huge returns Fulk suggested, does not excuse his conduct.

## V.

For the reasons stated above, the judgment of the district court is

AFFIRMED.