**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Phillip DeGERATTO,
Defendant–Appellant.**

**No. 88–2815.**

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 22, 1989.

Decided June 6, 1989.

As Modified June 8, 1989.

Kevin E. Milner, Asst. U.S. Atty., Hammond, Ind., for plaintiff-appellee.

Thomas P. Sullivan, Charles B. Sklarsky, Jenner & Block, Paul T. Julian, Julian & Associates, Adam Bourgeois, Chicago, Ill., for defendant-appellant.

Before WOOD, Jr., and MANION, Circuit Judges, and FAIRCHILD, Senior Circuit Judge.

HARLINGTON WOOD, Jr., Circuit Judge.

What should have been an ordinary prosecution for transporting and receiving stolen property was not.

On December 14, 1987, a federal grand jury returned a nine-count indictment against defendant Phillip DeGeratto.* Count 1 charged DeGeratto with conspiracy relating to the interstate transportation and receipt of stolen property in violation of 18 U.S.C. § 371. Counts 2, 5 and 8 charged DeGeratto with interstate transportation of a stolen motor vehicle in violation of 18 U.S.C. § 2312. Counts 3, 6 and 9 each charged DeGeratto with interstate transportation of stolen goods in violation of 18 U.S.C. § 2314. Counts 4 and 7 charged DeGeratto with receiving stolen goods in violation of 18 U.S.C. § 659. DeGeratto pled not guilty to all counts, but was convicted by the jury on each.[1]

## FACTUAL BACKGROUND

### A. The First Sale

In the words of the government, it presented voluminous evidence of the existence of an alleged conspiracy between DeGeratto and others for the purpose of stealing and selling truckloads of food products.

---

* In the indictment the defendant's last name was spelled as it appears in this opinion, but in the government's brief the name is consistently spelled "DeGerrato."

1. On September 8, 1988, the trial court sentenced DeGeratto, cumulatively, to a seven-year term of imprisonment, and a $65,000 fine. On counts 3, 6 and 9, the court suspended sentence, and placed DeGeratto on five years of probation, a condition of which is payment by DeGeratto of restitution.

The others later became government witnesses against DeGeratto. According to government witnesses, on December 17, 1982, Eddie Kenton Rains and Lummie Crawford stole a truck from a Union 76 truck stop in Sawyer, Michigan. The truck contained a cargo of 1,326 turkeys, which had an approximate value of $18,620.85. Prior to leaving the truck stop, Rains telephoned George Perry to inquire whether Perry could fence the stolen turkeys. Perry, in turn, contacted Alix Douyon. Douyon then allegedly contacted DeGeratto. According to Douyon, DeGeratto had previously indicated that he was in the market for stolen goods that he could sell through his stores, the Buddy Bear Food Centers.

"Buddy Bear" is the nickname of DeGeratto which he also used as his business name. There were three Buddy Bear Food Centers in the Chicago, Illinois area. DeGeratto was not, however, the actual owner of the stores. They were owned by the Loren Corporation, of which Loren Stern was the sole shareholder. DeGeratto, through his Buddy Bear Management Company, and by agreement with the Loren Corporation, managed the three stores. The meat departments in each were operated as concessions. Loren Corporation received 19% of the gross meat sales for its services to the concessionaires. Gerald Piazzi was the Loren Corporation's meat buyer and in that capacity purchased meat for the concessionaires. Upon receipt of a meat invoice, the concessionaire signed the invoice acknowledging receipt of the meat and then submitted it to the Loren Corporation's bookkeeper to draw a check payable to the supplier. Thereafter, Piazzi would review the invoices and checks, approve them, and give them to DeGeratto for signature. The concessionaires received weekly reports from the bookkeeper showing gross meat purchases, sales and other expenses.

Government witnesses painted the following picture of DeGeratto's supposed involvement in the stolen meat transactions. When DeGeratto received the turkey call from Douyon he asked when the turkeys had been stolen. Douyon told DeGeratto that he would have to call Perry for the information. After speaking with Perry, Douyon called DeGeratto back and told him that the "merchandise was just taken." A price was agreed upon. DeGeratto instructed Douyon to call Piazzi and make arrangements for delivery of the turkeys. Douyon called Piazzi and arrangements were made for delivery to the Roosevelt Road store at approximately 7:00 a.m. the next morning. Piazzi then called DeGeratto to confirm that Piazzi had made the deal with Douyon. DeGeratto arranged to have Jerry Hubbard, who was in charge of the safe at the Roosevelt Road store, give Piazzi approximately $4,000 to $6,000 from the safe so that Piazzi could pay the thieves. DeGeratto instructed Piazzi to pay the thieves "half now and half later" so that if he, DeGeratto, got caught with the stolen goods he would only lose half his money. DeGeratto and Piazzi had previously discussed buying stolen goods from Douyon to sell in the stores. DeGeratto had told Piazzi "that they could both make a lot of money on this," but that if they got caught to say nothing.

The following morning Rains and Crawford drove the truck to the Roosevelt Road store. Several people were there, including Douyon, Perry and Piazzi. As soon as the truck arrived the turkeys were unloaded. Piazzi received a bag of money from Hubbard which he then gave to Perry. Perry used the money to pay Douyon, Rains and Crawford. Perry then instructed Rains and Crawford to abandon the truck. They did so at the Water Street Market, approximately 10 to 15 blocks from the Roosevelt Road store. A few days later Perry came to see Piazzi at the Chicago Avenue store, and Piazzi, as instructed by DeGeratto, paid Perry an additional $4,000 to $6,000. DeGeratto also allegedly instructed Piazzi to prepare false invoices to make it appear as if the store had purchased the turkeys from legitimate vendors. Piazzi was further instructed to use a fictitious company as vendor. That name was then placed on the invoices. The amount indicated as owing to the fictitious company was the going rate for turkeys. Piazzi prepared the invoices and placed them with that week's

legitimate invoices so that the bookkeeper, not knowing of the scheme, would prepare a check for each of the three Buddy Bear stores for payment to the fictitious company. After the bookkeeper had prepared the checks, Piazzi took them to DeGeratto. DeGeratto told Piazzi to have Hubbard cash the checks. Hubbard did so and gave Piazzi the money minus the amount which Hubbard had removed from the safe for payment to the thieves. Hubbard repaid that amount to the safe. Piazzi took the cash to DeGeratto who paid him back approximately $2,000 to $3,000.

## B. *The Second Sale*

On April 30, 1983, Rains again stole a truckload of food products, this time with the assistance of Ron Dowden. The truck contained pork and processed meats having a combined approximate value of $53,-805.53. The theft took place at Tomenko's Truck Stop in Michigan City, Indiana. Once the truck was spotted, Rains telephoned Perry to come to the truck stop. Perry did so and upon arriving examined the bill of lading to ascertain what cargo the truck was transporting. Once Perry realized that the truck contained meat, he telephoned Douyon in an effort to sell the load. According to government witnesses, DeGeratto was also involved in this second stolen meat transaction. Douyon called DeGeratto and assured him that the load had been stolen only the day before. DeGeratto then instructed Douyon to make arrangements with Piazzi to have it delivered. Douyon then spoke to Piazzi and Perry and made arrangements for the load to be delivered to the Roosevelt Road store the following morning. Piazzi allegedly called DeGeratto to verify that DeGeratto and Douyon had made the deal. According to Piazzi, DeGeratto instructed Piazzi to do everything in the same manner as for the first transaction, including getting the money from Hubbard. In the morning Rains and Dowden transported the truck to the Roosevelt Road store. Among those present at the store were Perry, Douyon and Piazzi. After the truck was unloaded, Piazzi again received a bag of money from Hubbard and gave it to Perry as half pay-ment, with the other half to be paid within a few days. Perry used the money to pay Rains, Dowden and Douyon. As in the first transaction, Perry kept all of the money for himself from the second payment which he received from Piazzi a few days later. Once the truck was unloaded, Rains and Dowden abandoned it in the same area as the first time. Piazzi, again allegedly pursuant to DeGeratto's instructions, prepared fictitious invoices and proceeded in the same manner as in the first transaction. After Hubbard cashed the checks, Piazzi claimed he took the money to DeGeratto who paid him approximately $2,000 to $3,000.

## C. *The Third Sale*

On June 15, 1984, Rains assisted James Hurley in stealing a truckload of food products from the Travel Lodge Motel in Gary, Indiana. The truck contained 1,415 boxes of assorted meat products that had an approximate total value of $58,790.14. Rains, in an effort to sell the load after the theft, called Pierre Romeus, whom he knew to deal in stolen goods. Romeus telephoned Piazzi who in turn allegedly called DeGeratto. Piazzi testified that he told DeGeratto what type of food Romeus had and that DeGeratto instructed Piazzi to make the deal and to proceed as he had in the first two transactions. Piazzi told Romeus that although it was Thursday or Friday, the store would not take delivery of the goods until Monday morning. On Sunday night Rains and Hurley drove the truck from Indiana into Illinois. Once in Illinois they stopped in a parking lot to remove a padlock from the back of the truck. FBI agents had been surveilling the truck and arrested both men. On Monday morning when the truck did not arrive at the store, Piazzi called Romeus. Romeus told him that there was a small problem—the FBI was involved. Shortly thereafter Piazzi claimed that he told DeGeratto what had occurred, and that DeGeratto instructed Piazzi not to tell the FBI anything.

At trial the government called, among others, participants Rains, Dowden, Hurley, Perry, Douyon and Piazzi who testified pursuant to plea agreements. DeGeratto

testified in his own behalf and denied knowing anything about the three truckloads of stolen meat. In addition, the defense offered the testimony of the meat concessionaires from the three stores, who not only denied knowledge of the alleged transactions, but claimed that they could not have sold the stolen meat nor even have stored it for lack of freezer capacity. A receiving clerk and the general manager of the stores also testified that they did not see the turkeys in the area where government evidence indicated they had been temporarily stored.

## THE ISSUES

Although DeGeratto denied any participation in the stolen meat transactions the jury found him guilty. DeGeratto raises a series of claims of particular errors and also contends that the cumulative effect of the errors requires reversal.

The defense claims that the prosecutor, during cross-examination, was permitted to prejudicially inject evidence of a number of improper issues—an alleged connection between DeGeratto and a prostitution operation plus suggestions that DeGeratto was a "loan shark," that he had suppressed evidence, and that he had cheated his own meat concessionaires. Further claims of error allege that the prosecutor unjustifiedly made verbal attacks on defense counsel, that the prosecutor in closing argument misrepresented the record in regard to the meat storage capacity of the stores, that the trial judge prejudicially limited cross-examination of government witness Piazzi, that the prosecutor improperly elicited evidence about an unrelated kickback scheme, and that certain jury instructions were erroneous.

We will examine, at least to some extent, the principal specific claims of error, as well as the overall claim that the cumulative effect of all the claimed errors denied DeGeratto a fair trial.

## ANALYSIS

### A. The Prostitution Issue

■ We need to see how and why the prostitution issue got into this stolen property case, and what difference it makes.

After the trial was several days along, the prosecutor advised defense counsel that he had just received a transcript of DeGeratto testimony in a separate matter before a federal grand jury in Chicago. That grand jury, working with the Department of Justice Strike Force, was investigating possible violations of federal law in connection with a certain Chicago prostitution business. Several persons were suggested as grand jury targets including a person named Doris Fischer. However, the Strike Force prosecutor specifically advised DeGeratto when he appeared before that grand jury that he was "neither a target or [sic] a subject of this Grand Jury's investigation." The prosecutor in the present case advised defense counsel that he intended to use the prostitution transcript to cross-examine DeGeratto if he took the stand in his own defense. Defense counsel objected, but the trial judge, after examining the transcript, ruled that it involved a "bad act" of the defendant, and that therefore it could be used to impeach the credibility of DeGeratto if he testified.

The transcript of that grand jury testimony contains an explanation of DeGeratto's relationship to Stern, his former business partner, and to Doris Fischer, both targets of the prostitution investigation. In brief, in the grand jury transcript DeGeratto explains that he was a signatory on Loren Corporation's checking account, that he was asked to sign a check to Fischer, that he checked with his bookkeeper and was advised that the check had been prepared at the direction of Stern. DeGeratto then asked Stern about the check. Stern explained that Fischer was a business friend of his who had no means of honoring credit cards. Therefore, he was helping Fischer out by providing the credit card service through the "Buddy Bear" account for a fee of 15% of the credit card charges. DeGeratto thereafter proceeded to sign checks as presented payable to Fischer or her company, Butterfly Enterprises. About 90 Loren Corporation checks were processed in that manner. DeGeratto testified that he did not know Fischer at

the time or the nature of her business. He met her only after the credit card arrangement was terminated. That was at a party which Stern hosted at DeGeratto's house.

After DeGeratto testified on direct in the present case, the government, under a continuing objection from defense counsel, opened up the prostitution issue on cross-examination. DeGeratto was asked about meeting Fischer at the party at his house. He explained that it was Stern's party, not his. DeGeratto was asked if he had been told that Fischer was a "madam." He denied that he had been told that, but explained that nevertheless that was his impression. DeGeratto was then asked to explain to the jury what a madam is. "She is an older woman," he said, "who used younger women to go out and produce income." The prosecutor then put it more bluntly, stating that a madam "runs what is commonly referred to as a whorehouse." DeGeratto denied knowledge that Fischer ran a "whorehouse," but admitted he later found out about her business. The prosecutor then questioned DeGeratto about Loren Corporation's processing of the credit card charges generated by Fischer's prostitution business. DeGeratto continued to deny that he knew that the credit card charges were the result of, as the prosecutor put it, "persons having sex at her establishment." According to DeGeratto, Stern, also a lawyer, had told him that the credit card processing was legal. The prosecutor inquired about Loren Corporation checks given to Fischer at the end of every month. Were they, he inquired, "for the amount of money that had been accumulated at the house of prostitution during the last month?" Again, DeGeratto denied that he knew of the house of prostitution. He also denied that he got any of the 15% processing fee as that went to Loren Corporation. The prosecutor continued to pursue DeGeratto's signing of the monthly checks to Fischer. DeGeratto admittedly signed most of the checks for the Loren Corporation. The prosecutor, in further questioning, suggested that DeGeratto would sign checks to a food company, a bread store, another for lettuce, "and then there would be one to a house of prostitu-

tion." Again DeGeratto denied he knew of the house of prostitution. DeGeratto further explained that he asked Stern about the checks and was told just to sign them as Stern knew Fischer. It was Stern, DeGeratto explained, who owned Loren Corporation, and that he only had a management contract with it. Therefore, he signed what he was told to sign by Stern. The prosecutor then asked, "What kind of food did you believe that Butterfly Enterprises was supplying your store with?" DeGeratto answered that he had no idea. He conceded that the checks written to Fischer from the credit card processing amounted to about $64,000 over a three-year period. The prosecutor then asked DeGeratto if that "would be a lot of lettuce or tomatoes?" DeGeratto explained that Loren Corporation only profited about $9,000 from the credit card processing. Again DeGeratto denied that, at the time, he knew a prostitution business was involved. He found out about the prostitution later. DeGeratto was then asked several times if, after finding out about the nature of Fischer's business, he contacted the authorities. He explained that Stern at that time was already on trial in the prostitution case, that Loren Corporation was bankrupt, and that he himself had not been aware of any wrongdoing. The prosecutor left prostitution for the moment with the question whether DeGeratto was aware of the stolen turkeys being sold to his store, which DeGeratto denied. The prosecutor then returned to prostitution with additional inquiries about DeGeratto being subpoenaed before the grand jury, and inquired again about DeGeratto's knowledge of the prostitution business. With the same denials from DeGeratto that he did not know at the time, cross-examination was terminated.

The prosecutor returned to the prostitution issue briefly in rebuttal closing argument, "This guy [referring to DeGeratto] is not a sweet guy, a soft touch. He's a smart sophisticated operator making 700 grand a year that we know of, prostitution rings going through his business, buying

stolen food, loan business."[2]

DeGeratto strongly urges that all of the government's prostitution exploration was prejudicial error, admissible neither under Fed.R.Evid. 404(b) (prior bad act)[3] nor under 608(b)(1) (impeachment).[4] The trial judge did not specify which rule was deemed by him to permit the prostitution cross-examination and argument. In overruling DeGeratto's objections, the judge found only that the prostitution evidence involved "a bad act," that the "probative value outweighs any prejudice," and therefore, "it can be used to impeach the credibility of the defendant."

The government defends its use of the Strike Force investigation of the Fischer and Stern prostitution ring by arguing that the cross-examination was permitted as a proper attempt to impeach the defendant's credibility under Fed.R.Evid. 608(b), as well as "bad act" evidence under Fed.R.Evid. 404(b). The government, in its brief, characterizes the government's cross-examination as the prosecutor merely asking "the defendant several questions about his involvement with Stern and Fischer" in the prostitution activity. That cross-examination, however, cannot be so blandly minimized. The government continues in its brief to argue that the defendant "admitted" that each month he wrote a check to Butterfly Enterprises for the net amount of the prostitution ring's credit card receipts, and further that the store kept 15% as a commission for allowing the prostitution ring to use its credit card account. That characterization by the government is not quite accurate. DeGeratto only admitted writing the checks; he steadfastly denied knowledge of the prostitution activi-

ties. DeGeratto's denials are labeled by the government as "ludicrous."

The government argues for the application of Fed.R.Evid. 608(b), permitting, within the trial court's discretion, inquiry on cross-examination into specific instances of the conduct of the witness, provided the particular conduct is probative of truthfulness or untruthfulness, or concerns the witness's character for truthfulness or untruthfulness. The government relies upon *United States v. Fulk*, 816 F.2d 1202 (7th Cir.1987). In *Fulk*, the defendant was charged with interstate transportation of fraudulent securities. On cross-examination he denied ever being accused of misrepresentation. An effort was then made to impeach the defendant with evidence that his chiropractor's license had been suspended because of his deceptive practices. Although the district court sustained the defendant's objection, this court indicated that such questioning was proper under Rule 608(b). *Fulk*, 816 F.2d at 1206. *Fulk* is of little present help, however, as DeGeratto was never charged with any involvement in prostitution (in fact he was explicitly advised by the Strike Force attorney that he was not a grand jury target), and he never denied that he signed the checks issued to Butterfly Enterprises, merely that he did not know the nature of Fischer's business until after the fact. Fulk, on the other hand, directly denied any past misconduct, when in fact he had lost his chiropractor's license as a result of former misdeeds.

The government also relies on *United States v. Taylor*, 728 F.2d 864 (7th Cir. 1984). The defendant in *Taylor* was charged with possession of an unregistered machine gun. The defendant claimed that

---

**2.** The loan business is a separate issue we must also review.

**3.** Rule 404(b) of the Federal Rules of Evidence provides in pertinent part:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

**4.** Rule 608(b)(1) of the Federal Rules of Evidence provides in pertinent part:

Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility, other than conviction of crime as provided in rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning the witness' character for truthfulness or untruthfulness....

he had no knowledge of the gun's presence, nor of the 10 grams of cocaine found when he was arrested. On cross-examination he denied any familiarity with cocaine. He was then confronted with the fact that cocaine had been found in his home on a previous occasion and that he had been arrested for cocaine possession in Florida at one time. We held this to be proper cross-examination probative of defendant's untruthfulness. There is nothing similar in the present record, however, that sufficiently reveals the defendant's knowing connection with prostitution, only the prosecutor's questions, statements and argument, all of which DeGeratto denied.

Likewise, *United States v. Covelli,* 738 F.2d 847 (7th Cir.), *cert. denied,* 469 U.S. 867, 105 S.Ct. 211, 83 L.Ed.2d 141 (1984), is distinguishable. *Covelli* also involved a prosecution for transportation of stolen goods in interstate commerce. The prosecutor was allowed to cross-examine the defendant about his admission to a police officer that he had at one time faked an insanity defense and avoided trial. Corelli's credibility was at issue and the related inquiry constituted proper impeachment. In the present case, however, there was no admission or other evidence of DeGeratto's involvement in prostitution, only the government's questions and DeGeratto's denials.

In *United States v. Howard,* 774 F.2d 838, 844–45 (7th Cir.1985), we held it proper in a vote fraud prosecution to cross-examine the defendant about false statements on two recent employment applications. There was a demonstrated lack of credibility. In contrast, there is no such demonstration in the present case, and a prosecutorial hunch that DeGeratto knew more about the prostitution business than he admits is not enough.

The government responds to DeGeratto's argument that the prostitution prejudice was so great that it deprived him of a fair trial by saying that his argument "runs contrary to common sense," because DeGeratto was being charged with felonies and "prostitution ... is a misdemeanor." For the government to advance such an argument is what runs counter to "common sense." The prejudice from alleged prostitution involvement, at least with many citizens, does not turn on whether prostitution is a felony or only a misdemeanor, but on the very nature of the conduct. In any event the jury was given no such felony or misdemeanor characterization. The government adds that no suggestion was made that DeGeratto had any actual involvement in prostitution, only that DeGeratto helped facilitate the prostitution ring's financial situation. The government, in effect, argued a prostitution conspiracy. The government now unrealistically tries to minimize the prejudice from its prostitution questions injected and pursued at trial. That effort defies the government's own "common sense" standard which it seeks to have this court apply.

In any event, the government argues that the probative value of the prostitution questioning outweighed any prejudice, and therefore was proper credibility impeachment, citing *United States v. Fountain,* 768 F.2d 790, 794–95 (7th Cir.1985), *cert. denied sub nom. Gometz v. United States,* 475 U.S. 1124, 106 S.Ct. 1647, 90 L.Ed.2d 191 (1986). *Fountain* can be read to sustain the balancing of probative value and prejudice, which is a generally acknowledged process. In *Fountain,* however, the subject of the actual prior crimes of the defendant was touched on in direct, and thereafter not dwelt on in great detail by the prosecution. In those circumstances we held that the prosecutor "was entitled to amplify them slightly." Ordinarily error is found only when a prosecutor dwells at great length and in further detail on the particulars of prior crimes. 768 F.2d at 755.

In the present case, there was not only no actual evidence of prior prostitution crimes, there was not even a prior allegation against DeGeratto regarding prostitution. In fact, the Strike Force attorney denied that DeGeratto was a grand jury target. The present case is not a situation where a defendant's link to another criminal prosecution was amplified only slightly. The transcript strongly suggests that an

effort was made by the prosecutor to convict DeGeratto of an uncharged prostitution conspiracy. The prosecution's emphasis on prostitution was extremely prejudicial and excessive. It could not but depict DeGeratto before a jury as a bad man in ways unrelated to the stolen property charge upon which he was being tried. Whatever weighing and balancing there may have been in the admission of that evidence we hold it to have been a clear abuse of discretion. *United States v. Shoffner*, 826 F.2d 619, 635 (7th Cir.), *cert. denied sub nom. Stange v. United States*, —— U.S. ——, 108 S.Ct. 356, 98 L.Ed.2d 381 (1987). The prostitution questioning was not proper under Rule 608 because what alleged prostitution evidence the government had was not sufficient to permit a good faith belief that DeGeratto knowingly helped the prostitution operation. Even if the subject of prostitution could have been properly approached for impeachment purposes, this cross-examination went much too far with too little; the prosecutor should not have been allowed to continually focus on it. It was an unworthy attempt by the government.

Nor can this excursion into prostitution involvement be saved by an application of Fed.R.Evid. 404(b), in spite of the government's efforts to misapply the rule. The government does concede that evidence of other crimes or bad acts cannot be used to prove that a defendant committed the crime charged simply because he has committed crimes in the past. The government, citing *Shoffner*, 826 F.2d at 633, argues that prior crimes or bad acts "may be used, however, to demonstrate that the defendant, as in the instant case, had the opportunity and the intent to commit the crimes for which he is on trial as well as to show that he had knowledge of their commission." *Shoffner* involved a massive "chop shop" conspiracy. Evidence of a series of threats by the defendant against a possible government witness was properly admitted. The threats were the subject of a separate witness intimidation indictment. There was evidence that the defendant had told third parties shortly after the service of search warrants that "the squealers"

would be shot before he went to court.

Further, the jury in *Shoffner*, was instructed about the limited use of bad act evidence. In the present case no limiting instruction was given at the time the evidence was admitted, or later. Evidence of other bad acts can be very prejudicial. The use of that type of evidence is limited by the rule, and is to be considered by the jury only for certain purposes. A limiting instruction should ordinarily and routinely be given at the time the evidence is admitted, and again at the close of the case. DeGeratto's counsel did submit a Rule 404(b) limiting instruction for use at the conclusion of the trial, but the court failed to give it. Defense counsel thereafter failed to object to its not being given by the court, thereby ordinarily causing that failure to be reviewable only on a "plain error" standard. *United States v. Young*, 470 U.S. 1, 15–16, 105 S.Ct. 1038, 1046–1047, 84 L.Ed. 2d 1 (1985). Plain error is a concept to be used sparingly to prevent the miscarriage of justice. We have found plain error for failing to give a limiting instruction in some circumstances. *United States v. Johnson*, 515 F.2d 730 (7th Cir.1975). Furthermore, where misuse of Rule 404(b) results in the admission of extremely prejudicial evidence, as in this case, a limiting instruction may fail to prevent broad prejudicial consideration by the jury. Thus, even if the prostitution evidence were properly admissible under Rule 404(b), we would hold it plain error to have failed to give a limiting instruction.

However, this case need not turn on the failure to give one or two instructions. The prostitution evidence, contrary to the government's argument, should not have been admitted as bad act evidence because it does not meet the requirements of *United States v. Shackleford*, 738 F.2d 776, 779 (7th Cir.1984). We set forth in *Shackleford* four requirements for the admission of bad acts evidence. The first of these requirements is that the bad act evidence be addressed to some matter in issue other than the defendant's propensity to commit the crime charged. In the present case, prostitution had nothing to do with any

issue connected with the meat thefts. And no issue was created when DeGeratto denied knowledge of both the meat thefts and the prostitution ring. The government improperly sought to use DeGeratto's denial of knowledge about the prostitution ring to impeach his denial of the meat thefts. Further, there was no proof on the prostitution issue; there was no evidence from which the jury could reasonably infer that DeGeratto knowingly facilitated the prostitution ring, only innuendo from the government's cross-examination. Moreover, the trial judge did not inform the jury why it was hearing the prostitution dialogue, increasing the risk that the jury, left free to use the evidence as it saw fit, would infer that DeGeratto had a propensity to commit the meat thefts.

Under the second *Shackleford* requirement the other bad act must be similar enough and close enough in time to be relevant, in this case, to the meat theft charges. The existence of any such relationship between prostitution and the theft of meat escapes us.

■ The third original *Shackleford* requirement mandated that the bad act evidence be clear and convincing, but the Supreme Court moderated that strict requirement in *Huddleston v. United States,* 485 U.S. 681, 108 S.Ct. 1496, 1501, 99 L.Ed.2d 771 (1988). Now it is only necessary that a jury could reasonably find by a preponderance of the evidence that the defendant engaged in the other alleged bad act. DeGeratto, appearing before the Strike Force grand jury, was told specifically that he was not a target. He continually denied knowledge of the prostitution aspects of Fischer's use of the Loren Corporation's credit card account. His denials were not contradicted by any government evidence, only by the skepticism of the prosecutor. Mere skepticism, even if reasonable, does not meet the necessary burden of trial proof.

The last *Shackleford* requirement demands that the probative value of the bad act evidence outweigh the danger of unfair prejudice. The trial judge stated that rule but made no analysis of its application in

this case. Whatever exception was thought by the court to be applicable was not identified nor evaluated other than perfunctorily. We asked in *United States v. Beasley,* 809 F.2d 1273, 1279 (7th Cir.1987), that more be done before bad act evidence be admitted. It was not in this case. Unfair prejudice patently outweighed the probative value of the prostitution evidence— for any legitimate purpose.

DeGeratto's counsel did not object to the use of this bad act evidence in the prosecution's final argument. Unless defense counsel's original continuing objection to the prostitution inquiry carries over to the closing argument, we must review the reference to prostitution in closing argument under the plain error standard. *United States v. Young,* 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985). DeGeratto's attorney should have objected to the prosecution's reference to prostitution in closing, but we view his original continuing objection in these particular circumstances as continuing for the purpose of the final argument. Because the trial court admitted the evidence there was no reason to believe the court would not allow the government to argue it. In closing, the prosecutor argued that "the prostitution business" was significant. The prosecution then claimed that DeGeratto knew about the prostitution business, just as he knew that the meat had been stolen. There was evidence that DeGeratto knew the meat was stolen, but there was no actual admissible evidence by any standard that DeGeratto knew he was assisting a prostitution ring. The prosecution abused the fair trial process by engaging in the prostitution excursion which was clearly prejudicial error.

### B. *The Loan Sharking Allegations*

■ DeGeratto further complains that the prosecutor portrayed him as a "loan shark," although that term was not used. In the government's case-in-chief the prosecutor asked Perry, one of its witnesses who had been involved in the meat transactions, if he had ever met the defendant. Perry had not. The prosecutor then asked why Perry did not want to meet the defendant

and Perry responded, over defense objection, "For my own safety." Subsequently another government witness involved in the meat transactions, Douyon, was asked on direct examination by the government about being solicited by DeGeratto to send to DeGeratto any persons who were unable to obtain loans elsewhere. On cross-examination Douyon acknowledged that he had borrowed $4,000 from DeGeratto. DeGeratto's attorney was not permitted to show that the Douyon loan had not been repaid. However, when the prosecutor was cross-examining DeGeratto he returned to the subject of the Douyon loan. DeGeratto's attorney had written a letter to Douyon asking Douyon about repaying the loan to DeGeratto. Douyon wrote back, explaining in his letter that he had not repaid the loan because of lots of bad luck. Douyon's letter was produced and read to the jury during DeGeratto's direct examination in order to show Douyon's bias toward DeGeratto because Douyon had never repaid the loan. Douyon, it appeared, had gone to Haiti for a reason not clear in the record, but which was apparently clear to the prosecutor. Referring to the letter, the prosecutor characterized Douyon as being "so scared" of DeGeratto, because he was not able to repay the loan, that he had gotten out of town. An objection was sustained, but the prosecutor pursued the same line of questioning by asking DeGeratto if he was aware that the reason Douyon went to Haiti was because he could not repay the loan to DeGeratto. The loan and the fears of both Douyon and Perry were referred to in the prosecutor's closing argument, and both men were characterized as being "scared" of DeGeratto. Referring to DeGeratto, the prosecutor argued to the jury, as we have already mentioned, that, "He's a smart, sophisticated operator making 700 grand a year that we know of, prostitution rings going through his business, buying stolen food, loan business."

The thrust of the prosecutor's argument suggests that the government was endeavoring to convict the defendant, not just for the stolen meat transactions, but also for prostitution and "loan sharking," and generally for being an undesirable man. It is true that the term "loan shark" was not used before the jury, but that was the prosecution's clear implication. Although most members of the general public know nothing of loan sharking personally, nearly everyone knows what the practice entails. Loan sharking is generally considered to be the practice of loaning money at exorbitant interest to persons unable to secure loans from customary financial sources. Thereafter the use of force or threats of force insures payment. The government's characterization of DeGeratto's "loan business" could easily be understood by many to be loan sharking, although it was not so labeled.

Although no objection was made to the government's "loan shark" argument to the jury, in our view it was so inflammatory, when coupled with the government's examination of the witnesses, as to constitute error without need for a specific objection. The prosecution clearly prejudiced DeGeratto by wandering too far afield to convict him. He was pictured in various ways as being a "bad man," an offense nowhere defined in Title 18.

C. *The Missing Records*

A question also arose about the alleged destruction of certain store records. At trial, DeGeratto's counsel argued that Piazzi's testimony linking DeGeratto to the stolen meat transactions should not be believed because the government failed to introduce the checks and falsified invoices Piazzi claimed DeGeratto wrote to conceal the purchases of stolen meat. The government presented evidence that it had, more than once, unsuccessfully attempted to subpoena certain business records of the Loren Corporation from DeGeratto during the grand jury investigation with the stolen meat transactions. DeGeratto countered with evidence that he had each time told the government that he did not possess the records and that they could be obtained from the Loren Corporation offices. Just before trial in February 1988, the government finally served a subpoena on the Loren Corporation which complied by providing those records requested that could be

found. There was evidence that some records were missing, although no evidence was offered suggesting that DeGeratto was at fault.

In final argument, however, the prosecutor went beyond the evidence and stated that the missing records "had obviously been suppressed and are sitting in an ash tray somewhere." The prosecutor was warned by the court not to go outside the record, but he did by accusing DeGeratto, again without proof, in the prosecutor's words, of "deep sixing" the records. DeGeratto's counsel objected to this line of argument and moved for a mistrial which was denied. At oral argument before this court, the prosecutor, to his credit, conceded that at trial he had gone too far and had done a little testifying himself.

When argument departs from the facts in evidence, even without objection, the error may be so prejudicial as to be reversible. *United States v. Fearns*, 501 F.2d 486, 488–89 (7th Cir.1974). *See also United States v. Davis*, 532 F.2d 22, 27–28 (7th Cir.1976). While there may have been sufficient evidence at least to argue the inference that the defendant had destroyed incriminating records, it could not be stated to the jury, as a fact known to the prosecutor, that DeGeratto destroyed evidence. The missing evidence instruction given to the jury over defense objection only served to exacerbate the prejudicial effect of the prosecutor's comments. Sometimes in the heat of argument that line between proper and improper argument may be unintentionally crossed. In this case it was prejudicially crossed.

### D. *Other Issues*

DeGeratto raises other issues with varying degrees of merit. There is a question about the claimed unfair emphasis and characterization put on the financial return the defendant demanded from the meat concessionaires in the stores. We would not reverse on that issue.

There is also an objection to what is labelled "the prosecutor's unjustified attacks on defense counsel" in closing argument. At one point defendant's counsel objected and responded to the prosecutor's argument about certain phone calls. The prosecutor then said, "Judge, that is a total lie. I'm going to ask you to admonish this man," referring to defense counsel. In another context the prosecutor accused defendant's counsel of "once again trying to create an alibi at the last second." Additionally, the prosecutor attacked a particular defense by arguing that when defense counsel saw that the prosecution had him by the "short hairs" then that defense got "flushed down the toilet." The prosecution concluded with the comment that it was again "spanking time" for defense counsel.

We do not approve a government attorney at trial labelling defense counsel a liar or suggesting that defense counsel is trying to create an alibi. This case does not turn on that behavior of the prosecutor, however, nor on the unsuitability of some of the unnecessarily common terminology used by the Assistant United States Attorney in this trial.[5]

DeGeratto also argues that the prosecutor misrepresented the evidence about the meat storage capacity of the stores. He may have, but we need not pursue that factual issue; the storage capacity of the stores was a factual inquiry left to the jury's determination. Moreover, we doubt if the prosecutor's argument on that subject, in the context of the rest of his case, was of any moment.

DeGeratto also complains that the district court improperly granted a motion in limine to the government that prevented DeGeratto from introducing certain evidence at trial. After Piazzi, one of the government's chief witnesses against DeGeratto, had been indicted as a result of his role in the stolen meat transactions, he agreed as part of his plea arrangement to aid the government in prosecuting DeGeratto. Toward that end, Piazzi made a

5. Unfortunately this circuit recently has had to recognize the need to create a new committee, the Committee on Civility, to consider the un- professional conduct sometimes indulged in by members of bench and bar.

phone call to DeGeratto (which the FBI recorded) and attempted to elicit incriminating statements from DeGeratto. DeGeratto, however, made no inculpatory admissions during the conversation. Rather, his statements tended to support DeGeratto's position at trial that he knew nothing about the stolen meat transactions. Piazzi, of course, concealed his arrangement as an FBI informant, and even went so far as to ask DeGeratto's advice on how he should proceed. DeGeratto told Piazzi to simply tell the truth. The government prevented DeGeratto from introducing the contents of this telephone call, or from even cross-examining Piazzi about its occurance, alleging that it was inadmissible because it was self-serving, consistent hearsay.

In *United States v. Dellinger*, 472 F.2d 340, 380–82 (7th Cir.1972), *cert. denied*, 410 U.S. 970, 93 S.Ct. 1443, 35 L.Ed.2d 706 (1973), we held that a defendant's statement, even though it might be characterized as "self-serving," was not excludible from evidence on that ground alone, if it was otherwise admissible under the hearsay rule or its exceptions. The trial court in *Dellinger* had improperly excluded prior consistent statements of the defendants that were otherwise admissible under the hearsay rule and its exceptions. *United States v. Jackson*, 780 F.2d 1305 (7th Cir. 1986), cited by both parties, is merely an application of the standards articulated in *Dellinger*. We held that the trial court in *Jackson* properly excluded the defendants' self-serving statements; the statements were hearsay—offered for the truth of the matter asserted—and did not fall within any of the exceptions suggested by the defense. *See Jackson*, 780 F.2d at 1313–16.

A trial court's decision on the admissibility of evidence should not be overturned "absent a clear showing of an abuse of discretion." *Jackson*, 780 F.2d at 1314 (quoting *United States v. Harris*, 761 F.2d 394, 398 (7th Cir.1985)). After reviewing the circumstances under which the Piazzi–DeGeratto conversation took place, and comparing them to the scenarios detailed in *Dellinger* and *Jackson*, we cannot say that the trial court's refusal to admit the tape or transcripts of the call into evidence was a clear abuse of discretion. We believe, however, that the question is close enough that the district court, upon retrial, should feel free to reevaluate the admissibility of this conversation. Some, if not perhaps all, of the conversation may be found admissible under the hearsay rules. In any event, DeGeratto's statements should not be excluded on the mere basis that they are self-serving, if the defense establishes their admissibility as non-hearsay or hearsay that falls within one of the exceptions.

Furthermore, the defense makes a credible argument that DeGeratto was at least entitled to use the fact that the taped conversation occurred, and perhaps its contents, to impeach Piazzi on cross-examination, either by showing that he had a bias against DeGeratto, or that he had a proclivity toward untruthfulness. We note that the government barely addressed this issue in its brief, providing this court with no authority upon which to disagree with the defense. We therefore believe it also appropriate for the district court to reevaluate the admissibility of the telephone conversation as impeachment evidence, whatever it may decide about the use of the conversation as substantive evidence.

## CONCLUSION

This case was vigorously prosecuted by the government, which is admirable provided it is done in keeping with accepted standards, but here there was an accumulation of unfairness and overreaching. These government excesses deprived the defendant of a fair trial. This should have been a routine prosecution for the interstate transportation and receipt of truckloads of stolen meat. This case, however, unnecessarily went well beyond the limits of fairness a defendant has the right to expect from his own government. As to whether DeGeratto may in fact be guilty that is not for us to say. Only a jury may decide that question, after a trial kept within acceptable limits of fairness.

This conviction must be reversed and this cause remanded for a new trial.[6]

---

6. DeGeratto's appellate counsel Thomas P. Sullivan, Charles B. Sklarsky, Robert W. Kent, Jr., and Scott C. Tomassi of Jenner and Block, Chicago, Illinois did not represent DeGeratto at trial.