UNITED STATES of America ex rel.
Robert E. LEE,
Petitioner–Appellant,

v.

Mary FLANNIGAN, Administrator of
the Menard Psychiatric Center,
Respondent–Appellee.

No. 88–3355.

United States Court of Appeals,
Seventh Circuit.

Argued June 2, 1989.

Decided Sept. 18, 1989.

Rehearing and Rehearing En Banc
Denied Oct. 23, 1989.

Daniel R. Warren, Bradley P. Nelson, Jenner & Block, Chicago, Ill., for petitioner-appellant.

Terence M. Madsen, Jack Donatelli, Asst. Attys. Gen., Crim. Appeals Div., Chicago, Ill., for Mary Flannigan and Neil F. Hartigan, Atty. Gen. of State of Ill.

Before POSNER and MANION, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

ESCHBACH, Senior Circuit Judge.

Robert E. Lee, the petitioner-appellant, appeals from the district court's denial of his petition for a writ of habeas corpus. 701 F.Supp. 143. In separate trials, Lee was convicted of the murder and attempted armed robbery of William Hawbecker ("Hawbecker trial") and the armed robbery and attempted murder of Peter Larson ("Larson trial"). In a consolidated appeal, the Illinois Appellate Court reversed Lee's conviction for the attempted armed robbery of Hawbecker, but affirmed his other convictions. Lee was ultimately sentenced to a concurrent term of forty-years imprisonment for the murder of Hawbecker, twenty-years imprisonment for the attempted murder of Larson, and twenty-years imprisonment for the armed robbery of Larson.

On February 24, 1988, Lee filed a petition for a writ of habeas corpus, which the district court denied. On November 28, 1988, the district court granted Lee's request for a certificate of probable cause for appeal. On appeal, Lee raises five issues. First, Lee argues that the trial court erred in allowing Larson to identify Lee at both trials because the identification rested on an extremely suggestive hospital room show-up. Second, Lee contends that the admission of hearsay testimony concerning Hawbecker's description of his assailant at the Hawbecker trial violated Lee's sixth amendment right to confront witnesses. Third, Lee claims that the trial court erred in admitting evidence of the Larson shooting at the Hawbecker trial. Fourth, Lee argues that the prosecution improperly referred to his failure to testify at the Hawbecker trial and thereby violated the fifth amendment. Finally, Lee contends that his fourth amendment rights were violated at both trials when the government arrested him without probable cause and the district court relied on evidence obtained without probable cause in its harmless error analysis. For the reasons set forth below, we affirm the district court's denial of Lee's petition for a writ of habeas corpus.

## I. Statement of Facts

On January 26, 1984, William Hawbecker was shot in the head near 3400 North Lakewood Street Chicago between 7:00 and 7:15 p.m. Hawbecker immediately walked home and had a friend rush him to the hospital. At the hospital, Hawbecker told the emergency room doctor that he had been beaten and shot by two men as he was walking down the street. Later that evening, however, Hawbecker told two police officers that he was assaulted by a white male, 16–18 years old, approximately 5'8" tall, with long blond hair and wearing dark clothes. Hawbecker did not mention any other assailant, nor did he refer to an attempted robbery. The officers radioed this description of the culprit, excluding the reference to the dark clothes.

At approximately 8:15 p.m. that same evening, Chicago police officers Horstein and Eichler responded separately to a "man with a gun" call at 4200 North Kenmore Street. At the scene, at least one bystander named Lee as the person with the gun, and another bystander described the "man with a gun" as a young blond man, approximately 17–25 years old. Officer Horstein knew who Lee was, and Officer Eichler was familiar with Lee from past complaints to the police department about Lee shooting out street lights on Kenmore. Officers Horstein and Eichler then left the scene separately and drove through the area looking for the described person. Shortly thereafter, Officer Eichler spotted Lee. He stopped Lee and searched him, but found no gun. He then released Lee and radioed the details of this stop. Officer Horstein also spotted Lee approximately fifteen minutes later, but was unable to stop him due to traffic. Both officers had seen Lee in the general vicinity of the Hawbecker shooting.

At approximately 11:00 p.m. that same evening, Larson, a cab driver, picked up two young men. Larson described them as a Puerto Rican and a white male, approximately 18 years old, between 5'10" and 6' tall, with long blond hair. After following

their directions to an alley, which was just a few blocks from the site where Hawbecker was shot, the white man pointed a gun at Larson and robbed him. He ordered Larson to give the Puerto Rican the money from his pocket and then demanded Larson's wallet. After Larson gave him his wallet, the white man shot him twice in the back of the head.

Officers Cesario and Allota responded to the Larson shooting and spoke briefly with Larson. They also talked with a bystander, Deborah Jones, who witnessed the two assailants leaving the scene. She described one as a male Hispanic and the other as a slender white man, 19 years old, between 5'8" and 5'10", with long blond hair. They sent this description over the police radio. Shortly thereafter, Paula Tomas was shot while she was sitting with a friend in front of her home. She did not see her assailant.

On January 30, four days after the three shootings, Officer Horstein who had been looking for Lee found him and arrested Lee. That same day, Detective Stachula brought eight photographs, including one of Lee, to Larson who was in the hospital. Larson declined to make any identification because his vision was blurry from recent surgery.

The next day, Detective Stachula and Assistant State's Attorney Epach questioned Lee at the police station. Lee initially told them that he was at home the entire evening of January 26. When Detective Stachula called Lee's mother and asked her, she indicated that Lee had been in and out numerous times that evening. Lee then told them that he witnessed two of the three shootings, which someone who looked like him committed. Eventually, however, Lee confessed to the three shootings. Since Lee is mildly retarded and cannot read or write very well, Epach wrote Lee's confession for him. Epach would ask Lee a question concerning the shootings and write down Lee's response in a narrative form. Afterwards, Epach read the entire confession to Lee, who then signed it.

Later that day, Stachula again visited Larson at the hospital and told him that he had an individual who confessed to shooting him. Lee then entered the room. Larson identified Lee as the man who shot him, and Lee apologized to Larson. Stachula also took Lee to Tomas' room at the hospital, but she could not identify Lee as her assailant because she had not seen who shot her. Approximately two weeks later, Hawbecker died. The Cook County Medical Examiner's Office performed an autopsy and determined that Hawbecker died as a result of the gunshot wound to his head.

Lee received separate trials for the murder and attempted armed robbery of Hawbecker and the armed robbery and attempted murder of Larson. He was tried by a jury in the Hawbecker case, and by stipulation, he received a bench trial in the Larson case based solely on excerpts from the transcript of the Hawbecker trial. He was found guilty in both trials. In a consolidated appeal, the Illinois Appellate Court reversed his conviction for the attempted armed robbery of Hawbecker, but affirmed his other convictions. *See Illinois v. Lee,* 151 Ill.App.3d 510, 104 Ill.Dec. 136, 502 N.E.2d 399 (1986). The Illinois Supreme Court denied leave to appeal. *See Illinois v. Lee,* 115 Ill.App.2d 546, 110 Ill.Dec. 461, 511 N.E.2d 433 (1987). Lee was eventually sentenced to a concurrent term of twenty-years imprisonment for the attempted murder of Larson, twenty-years imprisonment for the armed robbery of Larson, and forty-years imprisonment for the murder of Hawbecker. On February 24, 1988, Lee filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The district court denied his petition. We now affirm the denial of his petition.

## II. Larson's Identification of Lee

■ Lee argues that the trial court should not have allowed Larson to identify Lee as his assailant at both trials. Lee contends that Larson's in-court identification was tainted by a prior unduly suggestive hospital room show-up; therefore, it is patently unreliable. In reviewing this is-

sue, we note that the reliability of an identification is a mixed question of law and fact that is not governed by § 2254(d)'s presumption of correctness. *See Sumner v. Mata,* 455 U.S. 591, 597, 102 S.Ct. 1303, 1306, 71 L.Ed.2d 480 (1982); *Love v. Young,* 781 F.2d 1307, 1311 (7th Cir.), *cert. denied,* 476 U.S. 1185, 106 S.Ct. 2923, 91 L.Ed.2d 551 (1986). However, the underlying factual determinations, such as whether the witness had an opportunity to observe the suspect, are presumed correct. *See Sumner,* 455 U.S. at 597, 102 S.Ct. at 1307; *United States ex rel. Haywood v. O'Leary,* 827 F.2d 52, 59 (7th Cir.1987).

■ It is well settled that courts must apply a two-step analysis in determining the admissibility of challenged police lineup identification testimony. First, the court must decide whether the police used an unduly suggestive pretrial procedure in obtaining an identification. *Manson v. Brathwaite,* 432 U.S. 98, 107, 97 S.Ct. 2243, 2249, 53 L.Ed.2d 140 (1977); *Kubat v. Thieret,* 867 F.2d 351, 357 (7th Cir.1989), *petition for cert. filed* (U.S. June 15, 1989). If the court finds that the police used an unduly suggestive procedure, then the court must determine whether, under all the circumstances, that suggestive procedure resulted in a substantial likelihood of irreparable misidentification. *Manson,* 432 U.S. at 107, 97 S.Ct. at 2249; *United States ex rel. Kosik v. Napoli,* 814 F.2d 1151, 1155 (7th Cir.1987). The state apparently concedes that the hospital room show-up was an unduly suggestive identification procedure. The state, however, argues that the trial court properly found that Larson's identification of Lee was still reliable.

■ Therefore, the precise issue before our court is whether, under all the circumstances, the hospital room show-up resulted in a substantial likelihood of irreparable misidentification by Larson. In making this reliability determination, we must consider the following five factors: (1) the opportunity of Larson to view his assailant at the time of the crime; (2) Larson's de-

gree of attention towards his assailant; (3) the accuracy of Larson's prior description of his assailant; (4) Larson's level of certainty that Lee was his assailant; and (5) the length of time between the crime and Larson's identification of Lee at the hospital room show-up. *See Manson,* 432 U.S. at 114, 97 S.Ct. at 2253; *Neil v. Biggers,* 409 U.S. 188, 199, 93 S.Ct. 375, 382, 34 L.Ed.2d 401 (1972); *United States ex rel. Hudson v. Brierton,* 699 F.2d 917, 924 (7th Cir.), *cert. denied,* 464 U.S. 833, 104 S.Ct. 114, 78 L.Ed.2d 115 (1983). In applying these factors, we realize that our role is a limited one, requiring us to determine only whether Larson's identification was "so unreliable that [Lee's] due process right to fair judicial procedures should have precluded an identification at trial." *Napoli,* 814 F.2d at 1156; *accord O'Leary,* 827 F.2d at 59.

The first factor we consider was Larson's ability to view his assailant at the time of the crime. At that time, Larson had a few opportunities in which he could have formed a definite and specific impression of his assailant's appearance. Larson first noticed his assailant when he went to pick him and his confederate up on a well-lit street corner.[1] *See* Tr. at 623–24. Additionally, Lee specifically testified that he saw the face of his assailant when he entered the cab while the dome light was on. *See id.* at 625. Moreover, Larson had other opportunities to view his assailant. For example, Larson testified that he saw his assailant when his assailant told him it was a robbery. *Id.* at 626. Lee also turned toward the back of the cab in order to give his wallet to his assailant. *Id.* at 628. From these circumstances, we conclude that Larson had ample opportunity to form an impression of his assailant's appearance at the time of the crime.

The second factor we weigh was Larson's attentiveness towards his assailant. This factor requires us to determine whether Larson took advantage of his opportunities to view his assailant. *See O'Leary,* 827 F.2d at 60; *Napoli,* 814 F.2d at 1158. The evidence supports the finding that he was attentive towards his assailant. Shortly after he was shot, Larson gave the police an accurate description of his assailant, including his height, approximate age, size, and hair color. *See O'Leary,* 827 F.2d at 60 (noting that the witness' "attentiveness to who his attacker was is borne out by the description he gave to" the police); *Napoli,* 814 F.2d at 1158 (noting that the witnesses were attentive in part because they were able to describe the suspects). Although Larson's description was not overly detailed and failed to note Lee's crossed eyes, it was still sufficient to show that he was attentive during the crime.

The third factor we consider was the accuracy of Larson's prior description of his assailant. On the same night that he was shot, Larson described his assailant as a slender white man, approximately 18 years old, between 5'10" and 6' tall, with long blond hair. *See* Tr. at 633, 851. This description accurately depicts Lee and thereby suggests that Larson's in-court identification of Lee was based on his observation of his assailant during the crime and not on the hospital room show-up.

The fourth factor we review was the level of certainty in Larson's identification of Lee at the hospital room show-up. When Lee was brought into Larson's hospital room, Larson identified him as his assailant and never wavered in his identification. Lee argues that Larson's identification lacked certainty because at his suppression hearing, Detective Stachula testi-

---

1. The Illinois Appellate Court found that the street corner was well-lit. *See Lee,* 104 Ill.Dec. at 144–45, 502 N.E.2d at 407–08. Lee, however, strenuously argues that there is no evidence in the record to support this fact. Although Larson did not directly testify that the street was well-lit, he did testify that he saw both men standing on the corner. He also testified that from his cab he observed that the white man was 5'10" to 6" tall, approximately 18 years old, with shoulder length blond hair. *See* Tr. at 624. From this testimony, the Illinois Appellate Court could properly make a factual finding that the street was well-lit. Therefore, because this finding of fact is supported by the record, we must presume that it is correct. *See Sumner v. Mata,* 449 U.S. 539, 546–47, 101 S.Ct. 764, 769, 66 L.Ed.2d 722 (1981); 28 U.S.C. § 2254(d).

fied that Larson had said that Lee "*appears* to be the man." *Id.* at 203j (emphasis added). When Lee's counsel questioned him at trial, however, Detective Stachula made it clear that Larson never qualified his identification of Lee with the word "appear." Rather, that was Detective Stachula's choice of word in reiterating Larson's identification. *Id.* at 684–85.

Lee also contends that Larson's identification of him lacks certainty because Larson failed to identify Lee from the eight photos that Detective Stachula brought to Larson in the hospital the day before the show-up. Larson, however, testified at trial that he did not want to make an identification from the photos because his vision was still blurry from recent surgery. *Id.* at 644. By the next day, however, Larson's vision had improved, which thereby enabled him to make an identification. *Id.* at 647–49. Under these circumstances, we cannot conclude that Larson's failure to identify Lee from the photos made his later identification less certain. Indeed, our court has already held that "a previous failure to make a positive identification from a photo array does not necessarily, or even normally, make the later identification less certain." *Napoli,* 814 F.2d at 1160; *see also United States v. Briggs,* 700 F.2d 408, 413 (7th Cir.) ("[A] witness's prior inability to identify a defendant goes to the credibility of the in-court identification and not to its admissibility, and thus raises a proper question of fact for the jury to determine."), *cert. denied,* 461 U.S. 947, 103 S.Ct. 2129, 77 L.Ed.2d 1307 (1983); 462 U.S. 1110, 103 S.Ct. 2463, 77 L.Ed.2d 1340 (1983).

The fifth and final factor we weigh in determining the reliability of an identification was the amount of time between the crime and Larson's identification of Lee. Larson identified Lee five days after his attack. This five-day period is so short that it supports the view that Larson's identification of Lee was reliable. *See Napoli,* 814 F.2d at 1160–61 ("The time between the shooting incident and the various pretrial identifications was in no case greater than two months, which is not enough by itself to raise serious questions about reliability."); *Jones v. Wisconsin,* 562 F.2d 440, 443 (7th Cir.1977) ("[T]he two-week interval between the crime and the show-ups ... was [not] so great as to undercut a witness' reliability.").

The application of these factors to the facts before us establishes that there was not a substantial likelihood of irreparable misidentification. Therefore, the trial court did not err in allowing Larson to identify Lee at both trials.

### III. Confrontation Clause

The sixth amendment to the Constitution requires that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him...." U.S. Const. amend. VI. Lee argues that the trial court violated his sixth amendment right to confront a witness against him when it allowed the prosecution to present hearsay testimony consisting of Hawbecker's description to the police of his assailant. The Illinois Appellate Court ruled that the trial court erred in admitting this hearsay testimony. However, it found such error to be harmless. *See Lee,* 104 Ill.Dec. at 147–48, 502 N.E.2d at 409–10. Although we are not bound by a state court's ruling that a constitutional

**2.** The state argues that we do not need to decide whether there was harmless error because Lee procedurally defaulted on his right to pursue this sixth amendment claim, and alternatively, Hawbecker's hearsay description of Lee was properly admitted since it had sufficient indicia of reliability. We reject both these arguments. First, Lee properly preserved his right to pursue this claim by presenting it to the Illinois Appellate Court. *See* Brief for Appellant, Rec.Supp.

at 57–58 (Lee's brief submitted to the Illinois Appellate Court). Second, Hawbecker's description of his assailant to the police lacks adequate indicia of reliability because it was not given "under circumstances which 'indicate that its content is probably true' ... and which provide the jury with a sufficient basis for judging its truthfulness." *United States v. Snyder,* 872 F.2d 1351, 1355 (7th Cir.1989) (citations omitted).

error is harmless, *see United States ex rel. Savory v. Lane,* 832 F.2d 1011, 1018 (7th Cir.1987), we agree with this determination[2] based on a *de novo* review of the record, *see United States ex rel. Scarpelli v. George,* 687 F.2d 1012, 1015 (7th Cir. 1982), *cert. denied,* 459 U.S. 1171, 103 S.Ct. 817, 74 L.Ed.2d 1015 (1983).

It is well settled that confrontation clause violations are subject to a harmless error analysis, *see, e.g., Cruz v. New York,* 481 U.S. 186, 194, 107 S.Ct. 1714, 1719, 95 L.Ed.2d 162 (1987); *Delaware v. Van Arsdall,* 475 U.S. 673, 684, 106 S.Ct. 1431, 1438, 89 L.Ed.2d 674 (1986); *Burns v. Clusen,* 798 F.2d 931, 943 (7th Cir.1986), and that the harmless error standard applies in habeas review, *see Savory,* 832 F.2d at 1016–17. This analysis requires us to determine whether presenting testimony of Hawbecker's description of his assailant to the jury was harmless beyond a reasonable doubt. *See Harrington v. California,* 395 U.S. 250, 251, 89 S.Ct. 1726, 1727, 23 L.Ed.2d 284 (1969); *Mattes v. Gagnon,* 700 F.2d 1096, 1105 (7th Cir.1983).

Even without Hawbecker's description of his assailant, there was plenty of other evidence which linked Lee to this crime. For example, evidence showed that the police interviewed Hawbecker at the hospital the night he was attacked, sent a message over their radio after speaking with him, and then proceeded to look for the assailant. *See* Tr. at 474–76. The jury also properly heard testimony that similar descriptions of the assailants in the Hawbecker and Larson shootings were given over the police radio. *See id.* at 822. From this testimony, the jury could reasonably conclude that Hawbecker had given the police a description of his assailant and that it matched Larson's description of his assailant. Additionally, Officer Eichler testified that he had stopped Lee the night of the shootings and that he later realized that Lee fit the description of the man who attacked Hawbecker. *Id.* at 823. The officer then sent this information along with Lee's name over the police radio. *Id.* Moreover, another police officer spotted Lee in the general vicinity of Hawbecker's attack, *id.* at 568, and at least one bystander gave a description of a "man with a gun" that matched Lee, *id.* at 821. From this testimony, the jury could conclude that Lee was seen with a gun in the area near Hawbecker's attack. Finally, without having remarked upon all the evidence linking Lee to Hawbecker's shooting, we note that the jury also knew that Lee confessed to shooting Hawbecker.[3] *See id.* at 725–26.

---

**3.** Lee contends that we should not rely on his confession or any other evidence allegedly obtained in violation of his fourth amendment rights in our harmless error analysis. We reject this argument. A fourth amendment claim for the suppression of evidence seized from an allegedly illegal arrest is not cognizable in habeas corpus so long as the state court gave the petitioner a full and fair opportunity to litigate this claim. *See, e.g., Stone v. Powell,* 428 U.S. 465, 495, 96 S.Ct. 3037, 3052, 49 L.Ed.2d 1067 (1976); *Willard v. Pearson,* 823 F.2d 1141, 1149 (7th Cir.1987); *United States ex rel. Patton v. Thieret,* 791 F.2d 543, 547 (7th Cir.), *cert. denied,* 479 U.S. 888, 107 S.Ct. 284, 93 L.Ed.2d 259 (1986). The trial court conducted a full evidentiary hearing based on Lee's pretrial motion to suppress the arrest due to lack of probable cause, which the court denied. *See* Tr. at 45–185. Lee appealed the trial court's finding of probable cause to the Illinois Appellate Court. After fully reviewing this issue based on the record, the Illinois Appellate Court affirmed the decision of the trial court. *See Lee,* 104 Ill.Dec. at 141–42,

502 N.E.2d at 404–05. Thus, since Lee received a full and fair hearing of his fourth amendment claim in the state court, we will not revisit this issue on habeas review.

Because the Illinois Appellate Court affirmed the trial court's finding of probable cause, Lee's confession and other evidence obtained from his arrest were properly admitted at trial. "We will therefore consider this properly admitted evidence in our determination of whether the evidence against the petitioner was so overwhelming that the ... [the sixth amendment violation] was harmless error." *Dortch v. O'Leary,* 863 F.2d 1337, 1345 n. 6 (7th Cir.1988), *cert. denied,* — U.S. —, 109 S.Ct. 1961, 104 L.Ed.2d 429 (1989). Lee, however, argues that we can reach his fourth amendment claim because the state court's determination was not supported by the record as a whole. *See Howard v. Pung,* 862 F.2d 1348, 1350 (8th Cir.1988) ("[A] state court evidentiary hearing *may be less than full and fair* if it yields factual determinations not fairly supported by the record as a whole." (emphasis added)), *cert. denied,* — U.S.

Thus, the state presented overwhelming evidence from which the jury could conclude that Lee shot Hawbecker.

Lee, however, argues that his confession is highly unreliable and therefore, not probative of his guilt. He contends that his confession, written by Assistant State's Attorney Epach, was nothing more than a summary of the police reports and that because he is mildly retarded, he could not possibly remember all the details contained in the confession. This argument is without merit. First, the confession states that Lee used "a silver .22 revolver" when he shot Hawbecker. *Id.* at 818. The police report on the Hawbecker shooting, however, does not state the color or the caliber of the gun. *Id.* at 817. Therefore, this fact supports the reliability of Lee's confession as being more than a mere summary of the police reports. Additionally, Lee apologized to Larson, *see id.* at 647, which also supports the reliability of his confession.

Lee also claims that his confession is unreliable because he presented a strong alibi, which demonstrated that he could not have possibly committed the shootings. At trial, Lee presented two witnesses, one of whom was his mother, who testified that Lee was at home at the time of the shootings. *Id.* at 905–08, 971–75. Lee's alibi, however, did not go unimpeached. Detective Stachula testified that a few days after the shootings, Lee's mother told him that Lee had been in and out numerous times the evening of the shootings. *Id.* at 1065. Moreover, the jury could not have found Lee guilty if they had believed his alibi. Therefore, the fact that Lee presented an alibi does not render his confession unreliable, and thus, we can use it to judge whether any confrontation clause violation was harmless beyond a reasonable doubt. *See Cruz*, 481 U.S. at 193–94, 107 S.Ct. at 1719.

Finally, as part of our harmless error analysis, we note that the tainted evidence was not that significant. Hawbecker described his assailant to the police as a slender white male, between 15–18 years old, 5′8″ to 5′10″, with long blond hair. Tr. at 851. As the district court aptly noted, this is only a general description of Lee, without any specific details which would make a strong impression on a jury. *See* District Court's Order, Rec. 29, at 4. The fact that this tainted evidence would not make a strong impression on the jury supports the view that the confrontation clause violation was harmless. *See United States ex rel. Sanders v. Lane*, 835 F.2d 1204, 1207 (7th Cir.1987) (noting that a harmless error analysis for a confrontation clause violation "must focus on the potential contribution of the tainted evidence"); *Savory*, 832 F.2d at 1020 (finding a confrontation clause violation harmless in part because the tainted evidence lacked probative value). Therefore, because the evidence implicating Lee as Hawbecker's assailant was overwhelming and the tainted evidence was insubstantial, we hold that the confrontation clause violation was harmless beyond a reasonable doubt.

### IV. Other Crime Evidence

The due process clause of the fourteenth amendment "guarantees the fundamental elements of fairness in a criminal trial." *Spencer v. Texas*, 385 U.S. 554, 563–64, 87 S.Ct. 648, 653, 17 L.Ed.2d 606 (1967). Lee argues that he was denied a fundamentally fair trial because the trial court allowed in evidence concerning the Larson shooting at the Hawbecker trial. The Illinois Appellate Court reviewed this issue and found that the trial court properly admitted the evidence of the Larson shooting because that evidence tended to show identity, time and place proximity, and intent, to rebut Lee's alibi, and to corroborate Lee's confession. *Lee*, 104 Ill.Dec. at 144, 502 N.E.2d at 407.

▮ Federal courts can grant habeas relief only when there is a violation of federal statutory or constitutional law. *See Wainwright v. Goode*, 464 U.S. 78, 83–84, 104 S.Ct. 378, 382, 78 L.Ed.2d 187 (1983); *Cole v. Young*, 817 F.2d 412, 416 (7th Cir.1987).

——, 109 S.Ct. 3247, 106 L.Ed.2d 593 (1989). Since we have already determined that Lee received a full and fair hearing in the state court, we reject this argument.

The admissibility of evidence in a state criminal trial, however, is generally a matter of state law. *See Gross v. Greer*, 773 F.2d 116, 119 (7th Cir.1985); *United States ex rel. Searcy v. Greer*, 768 F.2d 906, 910 (7th Cir.), *cert. denied*, 474 U.S. 996, 106 S.Ct. 412, 88 L.Ed.2d 363 (1985). Therefore, unless a specific constitutional right has been violated, a federal court can issue a writ of habeas corpus only when a state evidentiary ruling violates the defendant's due process rights by denying him a fundamentally fair trial. *See Woodruff v. Lane*, 818 F.2d 1369, 1373 (7th Cir.1987); *Cramer v. Fahner*, 683 F.2d 1376, 1385 (7th Cir.), *cert. denied*, 459 U.S. 1016, 103 S.Ct. 376, 74 L.Ed.2d 509 (1982). In regard to the specific issue before us, Lee would have been denied a fundamentally fair trial only if the probative value of the other crime evidence (the Larson shooting) is greatly outweighed by its prejudicial effect. *Woodruff*, 818 F.2d at 1373; *United States ex rel. Bibbs v. Twomey*, 506 F.2d 1220, 1223 (7th Cir.1974); *United States ex rel. Durso v. Pate*, 426 F.2d 1083, 1086 (7th Cir.1970), *cert. denied*, 400 U.S. 995, 91 S.Ct. 469, 27 L.Ed.2d 445 (1971).

██ After reviewing the record, we cannot conclude that the probative value of the evidence concerning the Larson shooting is greatly outweighed by its prejudicial effect. That evidence was *extremely* probative on various issues that linked Lee to the Hawbecker shooting. First, the evidence of the Larson shooting tended to corroborate Lee's confession, in which he admitted to shooting Hawbecker. Second, the evidence of the Larson shooting also tend-

ed to rebut Lee's alibi that he was at home at the time of both shootings. By showing that Lee was not at home at the time Larson was shot, the state undermined the truthfulness and credibility of his alibi as a whole. Additionally, this evidence placed Lee, carrying a gun, in the general vicinity of the Hawbecker shooting on the night Hawbecker was shot. Finally, the evidence concerning the Larson shooting helped to establish Lee's intent to shoot people.

Of course, this evidence was also prejudicial to Lee. However, "granting a petition for habeas corpus requires more than a mere finding of prejudice." *Woodruff*, 818 F.2d at 1373; *see United States ex rel. Bleimehl v. Cannon*, 525 F.2d 414, 421 (7th Cir.1975). Because we cannot say that the prejudicial effect of the evidence concerning the Larson shooting greatly outweighed its highly probative value, Lee was not denied his due process right to a fundamentally fair trial by the admitting of this evidence at the Hawbecker trial.[4]

## V. Lee's Fifth Amendment Claim

At trial, Lee presented Dr. Arbit, a psychologist, as an expert witness. Dr. Arbit testified that Lee was mentally deficient and had poor memory skills. Tr. at 1016–19. Dr. Arbit also testified that because of Lee's poor memory skills, Lee was prone to confabulation—he would make up things he simply could not remember. *Id.* at 1020–21. From Dr. Arbit's testimony, Lee wanted the jury to infer that his confession was unreliable because it was a confabulation. *See id.* at 1121–23 (closing argu-

---

**4.** Lee relies on our recent case of *United States v. DeGeratto*, 876 F.2d 576 (7th Cir.1989), to support his claim that he was denied a fundamentally fair trial by the admitting of evidence concerning the Larson shooting at the Hawbecker trial. In *DeGeratto*, the defendant was convicted of transporting and receiving stolen property and of conspiring to transport and receive stolen property. On appeal, our court reversed his conviction because the government had continually focused on other crime evidence suggesting that the defendant was involved in a prostitution conspiracy even though there was "no actual evidence of prior prostitution crimes" or "even a prior allegation against [the defendant] regarding prostitution." *Id.* at

583. Indeed, our court noted that the trial transcript suggested that the government tried to depict the defendant as a bad man and to convict the defendant "of an uncharged prostitution conspiracy." *Id.* at 584.

Lee's reliance upon *DeGeratto* is misplaced. First, unlike the situation in *DeGeratto*, there was ample evidence to link Lee to the Larson shooting. Additionally, this evidence was not presented to the jury to show that Lee was a bad man, nor to convict him of the Larson shooting at the Hawbecker trial. Rather, evidence concerning the Larson shooting was admitted because it was relevant to issues involved in the Hawbecker trial.

ment). On cross-examination, the prosecution asked Dr. Arbit, "As he sits here he would be able to tell us, if he chose, if he shot somebody in the head four days ago, wouldn't he?" *Id.* at 1044. Lee objected to this question, and the trial court sustained that objection. *Id.*

Lee contends that the prosecution violated his fifth amendment right not to testify by referring to his failure to take the stand. The fifth amendment forbids the prosecution to comment on a defendant's failure to testify. *Griffin v. California*, 380 U.S. 609, 615, 85 S.Ct. 1229, 1233, 14 L.Ed.2d 106 (1965); *United States v. Dominguez*, 835 F.2d 694, 699 (7th Cir. 1987), *cert. denied*, — U.S. —, 108 S.Ct. 1234, 99 L.Ed.2d 433 (1988). A prosecutor's direct reference to a defendant's failure to take the stand is clearly a violation of the fifth amendment. *United States ex rel. Burke v. Greer*, 756 F.2d 1295, 1300 (7th Cir.1985); *United States v. Buege*, 578 F.2d 187, 188 (7th Cir.), *cert. denied*, 439 U.S. 871, 99 S.Ct. 203, 58 L.Ed.2d 183 (1978). An indirect reference, however, is a violation only if "the language appears 'manifestly intended or was of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify.'" *United States v. DiCaro*, 852 F.2d 259, 263 (7th Cir.1988) (quoting *United States v. Lyon*, 397 F.2d 505, 509 (7th Cir.), *cert. denied*, 393 U.S. 846, 89 S.Ct. 131, 21 L.Ed.2d 117 (1968)); *accord United States v. Perez*, 870 F.2d 1222, 1229 (7th Cir.1989), *petition for cert. filed* (U.S. June 28, 1989).

In reviewing this issue, the Illinois Appellate Court refused to reverse his conviction and found that the prosecution "clearly was trying to rebut the inference resulting from defense counsel's direct examination of Dr. Arbit." *Lee*, 104 Ill.Dec. at 148, 502 N.E.2d at 411. On habeas review, we must presume that this finding of fact that the prosecution intended only to rebut an inference from Dr. Arbit's testimony is correct so long as this factual finding is supported by the record. *See* 28 U.S.C. § 2254(d). After reviewing the record, we agree with and defer to the Illinois Appellate Court's determination that the prosecution was merely trying to rebut an inference that the confession was a confabulation. Therefore, we do not believe that this question was either a direct or indirect reference to Lee's failure to testify.

Even if we were to assume that this question was an indirect reference to Lee's failure to take the stand, we would still reject Lee's fifth amendment claim. By examining the prosecution's question in the context in which it was asked, *see United States v. Robinson*, 485 U.S. 25, —, 108 S.Ct. 864, 869, 99 L.Ed.2d 23 (1988); *United States v. Hernandez*, 865 F.2d 925, 929 (7th Cir.1989), it seems eminently clear that this question was not manifestly intended nor naturally or necessarily interpreted by the jury as a comment on Lee's failure to testify. As we already observed, Lee wanted the jury to conclude that he could not have possibly remembered all the details in the confession; therefore, the confession was nothing more than a confabulation. By asking Dr. Arbit whether Lee could state whether he shot someone four days ago, the prosecution was merely trying to show that the confession was reliable because Lee confessed to shooting Larson and Hawbecker a few days after he shot them. In other words, even with Lee's poor memory skills, the prosecution wanted the jury to conclude that Lee could still have reliably remembered shooting Larson and Hawbecker on the day that he confessed. The jury undoubtedly understood this question as focusing on Lee's ability to remember, the subject of Dr. Arbit's testimony, rather than his failure to take the stand. Therefore, even if this question indirectly referred to Lee's failure to testify, it did not constitute a fifth amendment violation.

Finally, even if we were to consider this question a violation of Lee's fifth amendment right not to testify, such a violation would be harmless beyond a reasonable doubt. A prosecution's improper reference to a defendant's failure to testify

is harmless beyond a reasonable doubt if, absent the reference, "the jury would have returned a verdict of guilty." *United States v. Hasting*, 461 U.S. 499, 510–11, 103 S.Ct. 1974, 1981, 76 L.Ed.2d 96 (1983); *see Williams v. Lane*, 826 F.2d 654, 666 (7th Cir.), *cert. denied*, 484 U.S. 957, 108 S.Ct. 353, 98 L.Ed.2d 378 (1987). After reviewing the record, we conclude that the jury would have convicted Lee even without the alleged reference to Lee's failure to testify. As we already noted, the evidence against Lee was overwhelming. Additionally, we find it significant that there was only one comment that contained the allegedly offending material, and the trial court sustained Lee's objection to the question. Tr. at 1044. Under these circumstances, even if there was a fifth amendment violation, such violation was harmless beyond a reasonable doubt.

### VI. Conclusion

For all the foregoing reasons, the district court's decision to deny Lee's petition for a writ of habeas corpus is

AFFIRMED.