Todd A. BRECHT, Petitioner,

v.

Gordon A. ABRAHAMSON, Respondent.

No. 90–C–603–C.

United States District Court,
W.D. Wisconsin.

March 14, 1991.

Stan Thomas, Stevens Point, Wis., for petitioner.

Jeffrey M. Gabrysiak, Asst. Atty. Gen., Madison, Wis., for respondent.

CRABB, Chief Judge.

This is a petition for a writ of habeas corpus, filed pursuant to 28 U.S.C. § 2254. Petitioner, an inmate at the Dodge Correctional Institution in Waupun, Wisconsin, contends that he is in custody in violation of the Constitution of the United States. Petitioner seeks relief on three separate grounds: 1) that the state's use of his pretrial silence infringed on his Fifth and Fourteenth Amendment rights; 2) that certain rulings by the state court involving evidence of his homosexuality and rebuttal evidence of a prior worthless check conviction violated his due process rights; and 3) that the trial court's reliance on an ex parte trial brief violated his due process rights. Petitioner has exhausted his state remedies as required under 28 U.S.C. § 2254.

After reviewing the entire record, I conclude that references to petitioner's post-*Miranda* silence on cross-examination and in closing argument violated his due process rights and did not constitute harmless error. However, the state's references to petitioner's pre-*Miranda* silence did not infringe on his constitutional rights. Also, I conclude that the state court erred in admitting evidence about petitioner's homosexuality and in ruling that testimony on a prior worthless check conviction would be admissible to rebut testimony on petitioner's non-violent character. Taken together, these evidentiary rulings are sufficiently prejudicial to violate petitioner's rights to a fundamentally fair trial. Finally, I conclude that petitioner's claim regarding the

state's ex parte trial brief has no merit in light of petitioner's consent to the use of ex parte briefs and the absence of improper material in the brief.

In habeas corpus actions, state court findings of fact are presumed correct unless upon consideration of the record as a whole, the federal court concludes that factual determinations are not "fairly supported" by the record. 28 U.S.C. § 2254(d)(8); *United States ex rel. Savory v. Lane*, 832 F.2d 1011, 1019 (7th Cir.1987). Petitioner does not object to the accuracy or completeness of the state court findings. Therefore, I adopt the following facts paraphrased from the Wisconsin supreme court's decision in *State v. Brecht*, 143 Wis.2d 297, 421 N.W.2d 96 (1988), and the Wisconsin Court of Appeals' decision in *State v. Brecht*, 138 Wis.2d 158, 405 N.W.2d 718 (Ct.App.1987), supplemented by pertinent facts from the record.

### Facts Found by State Courts

On October 17, 1985, petitioner shot and wounded his brother-in-law, Roger Hartman, who was the district attorney for Buffalo County, Wisconsin. Hartman died several weeks later. At his trial, petitioner testified that the shooting was accidental. However, the jury found him guilty of first degree murder.

Evidence at the trial disclosed the following: on October 12, 1985, Molly and Roger Hartman went to the Georgia State prison to secure the release of petitioner, who is Molly Hartman's younger brother. Petitioner's release from prison and placement on probation were conditioned on payment of $3,750 in restitution. The Hartmans paid his restitution and obtained his release and the transfer of his probation to Wisconsin.

The Hartmans brought petitioner to their home in Alma, Wisconsin, where he was to stay until an opening became available in an Eau Claire halfway house. The Hartmans told petitioner that while he lived in their home he was to refrain from drinking and from homosexual activity in the Alma area.

Petitioner testified that on the day of the shooting he had been drinking and playing with a gun that belonged to Roger Hartman while Hartman was at work and Molly Hartman was out shopping. Petitioner had been using the gun to shoot at tin cans in the Hartman's yard, when he saw Roger Hartman pull into the driveway. Because he did not want Hartman to see him with the gun, petitioner ran into the rear garage and entered a downstairs hallway. Petitioner explained that he intended to replace the gun in the upstairs room where he had found it.

Petitioner testified that he had stopped to listen for Hartman, heard nothing, and started running for the stairs to the upper level of the house when he tripped and the gun discharged. A bullet struck Hartman in the back.

Petitioner yelled to Hartman and looked for him but Hartman had disappeared. Petitioner then took Molly Hartman's car and drove around the area looking for Hartman. When petitioner saw Hartman at the door of a neighbor's house, petitioner drove off in the car. The Hartman car was observed traveling at a faster than normal speed away from Alma and toward Fountain City.

Neighbors of the Hartmans testified that Roger Hartman came to their door seeking help and told them that petitioner had shot him. Police officers who had surveyed the Hartman residence after the shooting testified that they had found beer cans in the house, and a liquor bottle and a soda can with a bullet hole in it and a spent .22 casing in the backyard. Experts from the State Crime Laboratory testified that petitioner's fingerprints were on an ammunition box and on a brandy bottle found in the Hartman home. There was additional testimony that the doorway area leading into the hall from the garage was covered with tightly stretched carpet and that nothing was observed on which one could trip.

Meanwhile, petitioner had driven the Hartman car into a ditch near Fountain City, rendering the car inoperable. Officer Zeller arrived and offered petitioner assistance with the car, but petitioner told Zeller

that his sister would call a wrecker for him. Petitioner then caught a ride from a stranger, Melvin Schlesselman, to the nearest town, Winona, Minnesota. He did not mention the shooting incident to either Zeller or Schlesselman.

In Winona, petitioner was stopped by the police in a shopping center. When his identity was ascertained, he was arrested for the shooting of Hartman in Wisconsin. Petitioner told Officer Papke, one of the arresting officers, that it was a mistake and that he wanted to talk with "somebody that would understand [him]." Neither petitioner's testimony nor that of the police officer indicates that petitioner explained the shooting incident upon arrest.

The record is unclear when petitioner received his *Miranda* warnings. The state submitted testimony by two of the five officers involved in the arrest, who testified that petitioner was not given his *Miranda* warnings in their presence. However, the record does reflect that petitioner received his *Miranda* warnings at his initial appearance.

On November 11, 1985, Roger Hartman died. A coroner testified that the bullet wound was a substantial factor in producing his death. He also testified that the bullet entered Hartman's back and exited his chest, traveling on a basically horizontal to slightly downward trajectory.

At trial, the state questioned Zeller, Schlesselman and Papke during its case-in-chief about petitioner's failure to mention Hartman's condition and the accidental nature of the shooting. Additionally, the state attempted to impeach petitioner's credibility directly by cross-examining him on his pre-trial silence concerning the shooting and by making reference in closing argument to his silence.

The first reference to petitioner's silence was elicited from officer Zeller, the officer who spoke to petitioner when his car was in the ditch.

Q. Did you speak with this person [petitioner]?
A. Yes.
Q. What did you say?

A. I asked him for his name, and I also asked him if he needed a wrecker, and where he was from.
Q. What did he respond?
A. He stated his name was Todd Brecht, and he stated that he was from Alma. In reference to the wrecker, he said, "My sister will get a wrecker from Alma."
Q. Did he say anything else?
A. No.

Schlesselman testified on direct examination by the state:

Q. At any time during that period of time did he ever ask you to call and [sic] ambulance for anyone?
A. No sir.
Q. Did he ever ask you to call the police for him?
A. No sir.
Q. Did he ever mention a Roger Hartman to you?
A. No sir.

On cross-examination of Papke, one of the officers who apprehended petitioner in Winona, petitioner's counsel elicited the following:

Q. After you had taken him into custody he made a statement to you as you approached the squad car didn't he?
A. Yes.
Q. In fact he told you that it was a big mistake, he wanted to talk to someone.
A. Yes he did.
Q. He never explained further to you what he meant by "big mistake," did he?
A. No he didn't.

In response, the state conducted redirect examination of Papke.

Q. Officer Papke did you or anyone else in your presence advise the defendant of his constitutional rights?
A. No.
Q. Now you stated he said it was a big mistake—did he say what was a big mistake?
A. No he didn't.
Q. Did he offer any explanation about anything whatever?

A. No.

.    .    .    .    .

Q. Was he advised as to why he was being taken into custody?

A. Yes he was.

Q. Again you stated what?

A. I told him he was sought by Buffalo County authorities for a shooting incident in Wisconsin.

Q. Did he explain anything about a shooting incident to you?

A. No he didn't.

Q. To anyone in your presence?

A. Not to my knowledge, no.

The state elicited testimony from Deputy Bratner during its case-in-chief.

Q. Did you arrest the defendant?

A. I served the arrest warrant on him, yes.

Q. Did you give him [sic] Miranda warning?

A. No.

On cross-examination, the state engaged petitioner in the following exchange:

Q. In fact the first time you have ever told this story is when you testified here today was it not?

.    .    .    .    .

A. You mean the story of what actually happened?

Q. Yes.

A. I knew what happened, I'm just telling it the way it happened, yes, I didn't have a chance to talk to anyone, I didn't want to call somebody from a phone and give up my rights, so I didn't want to talk about it, no sir.

On re-cross examination, the state inquired:

Q. Did you tell anyone about what had happened in Alma?

A. No I did not.

During closing argument, the state made the following comments:

... and remember that Mr. Brecht never volunteered until in this courtroom what happened in the Hartman residence....

.    .    .    .    .

... he made no statements to the law enforcement officers....

.    .    .    .    .

He sits back here and sees all of our evidence go in and then comes out with this crazy story....

.    .    .    .    .

I know what I'd say, I'd say, I'd say "hold on, this was a mistake, this was an accident, let me tell you what happened," but he didn't say that did he. No, he waited until he hears our story.

The state also sought to introduce evidence of petitioner's homosexuality to establish a possible motive for the shooting. The trial court permitted such evidence, over petitioner's objection, noting its relevancy to the issue of motive. During trial, the state produced letters petitioner had written to an inmate in the Georgia prison where petitioner had been incarcerated. Additionally, the state elicited testimony from Molly Hartman that her husband had disapproved of petitioner's homosexuality. However, she gave conflicting testimony as to whether her husband had communicated this disapproval directly to petitioner. The trial court gave the following instruction to the jury:

The evidence that the defendant is a homosexual ... was also received solely so you could understand his presence in the Hartman home and the conditions imposed by them.

You must not conclude that because he ... is a homosexual ... that it is proof that he committed the offense with which he is now charged. That evidence was received only to give you the whole picture of the relationship between him and the Hartmans.

Petitioner sought to call his probation officer to testify about petitioner's non-violent character. The trial court ruled that the introduction of such evidence would also permit the state to cross-examine the officer about petitioner's conviction for writing worthless checks. Consequently, petitioner chose not to call his probation officer and rested his case.

Both parties stipulated to the filing of ex parte briefs to the court. These briefs were subsequently filed in open court.

After the jury verdict, petitioner was sentenced to life in prison with a penalty enhancement for use of a dangerous weapon and for being a repeat offender. On appeal, the Wisconsin Court of Appeals reversed the conviction on the grounds that the state's references to petitioner's silence impermissibly infringed upon petitioner's right to silence and to a fair trial, and that such references were prejudicial. The court further concluded that the trial court erred in admitting evidence of petitioner's homosexuality and in ruling that the state could cross-examine the probation officer on petitioner's worthless checks conviction.

*Additional Facts From The Record*

At the pretrial hearing on petitioner's motion in limine to exclude certain evidence, including evidence of his sexual preference, the state represented to the trial court that "Mrs. Hartman didn't have a lot of problem with [petitioner's homosexuality] but Mr. Hartman did and made this known to the defendant. All of this Mrs. Hartman will testify about." The trial court ruled that, despite its prejudicial nature, the evidence had some bearing on the relationship between Hartman and petitioner and a possible motive. At trial, Molly Hartman testified as follows:

Q. Did [petitioner] tell you that he was a homosexual?

A. Yes.

Q. That week after returning home did you and Roger discuss the homosexuality with Todd?

A. Yes.

Q. On about how many occasions?

A. 3–4 perhaps.

Q. What was Roger's attitude concerning Todd's homosexuality?

. . . . .

A. Roger had a hard time accepting it, he could not udnerstand [sic] it.

On cross-examination by petitioner's counsel, Molly Hartman testified further.

Q. ... Now you indicated ... that Roger couldn't understand [petitioner's] homosexuality. Could you explain what you meant by that?

A. Well I guess it's just that way, I guess as far as Roger was concerned he couldn't understand homosexuality, he couldn't understand why that would be a male preference.

Q. Did he express the fact that he could not understand it to Todd?

A. I don't know.

Q. Did he ever do that in your presence?

A. No.

Q. Now you also indicated that Roger had a hard time accepting Todd's homosexuality or bisexuality. Is that the same as not being able to understand it, or is that something different that you were trying to explain?

A. I guess that is a little different.

Q. Could you explain what your understanding was of what was said in terms of how he had a hard time accepting it?

A. I guess it's just the conservative attitude that—he didn't want a brother-in-law who was a homosexual.

Q. Did he openly express this to Todd?

A. No.

Q. Did he ever do so in your presence?

A. No.

Q. So if I understand it then, his attitude of having a hard time in accepting and not being able to understand it were things that had been Roger's reaction to the things that were communicated to you in private?

A. Yes.

. . . . .

Q. Were there ever any cross words between Roger and Todd that you were aware of?

A. I'm not aware of any arguments.

Q. And at the time Todd was there you thought basically that their relationship, yours and Todds [sic], and Todd's and Roger's relationship was a good relationship?

A. Yes.

Molly Hartman also corroborated petitioner's testimony that he had problems walking and jogging because of a previous foot injury.

One of the neighbors who assisted Hartman just after the shooting testified that she asked Hartman whether he thought petitioner had anything against him. Hartman replied, "I don't know."

After accepting the state's petition for review, the Supreme Court of Wisconsin reversed the decision by the Wisconsin Court of Appeals. The supreme court held that the references to petitioner's pre-*Miranda* silence were not constitutional violations. Although it found that the references to petitioner's post-*Miranda* silence did violate petitioner's due process rights, the supreme court found the references to constitute harmless error. In addition, the supreme court concluded that the trial court did not abuse its discretion in admitting evidence of petitioner's homosexuality, and that it committed harmless error in ruling that the worthless check convictions were admissible rebuttal evidence to the probation officer's proposed testimony on petitioner's non-violent character. Finally, the supreme court concluded that petitioner was not denied a fair trial by the content of the state's ex parte trial brief.

## OPINION

*Use of Pre-trial Silence*

■ Petitioner contends that all use by the state of his pretrial silence violates his rights under the Fifth and Fourteenth Amendments.[1] The Fifth Amendment right against self-incrimination guarantees a criminal defendant the right to remain silent after he is arrested and precludes the prosecution from commenting on the silence of a defendant who asserts the right. *Griffin v. California*, 380 U.S. 609, 614, 85 S.Ct. 1229, 1232, 14 L.Ed.2d 106 (1965). To safeguard Fifth Amendment rights, the Supreme Court requires that a person taken into custody be advised immediately "that

he has the right to remain silent, that anything he says can be used against him in a court of law, that he has a right to the presence of an attorney, and that if he cannot afford an attorney, one will be appointed for him prior to any questioning." *Miranda v. Arizona*, 384 U.S. 436, 479, 86 S.Ct. 1602, 1630, 16 L.Ed.2d 694 (1966).

In a later case, *Doyle v. Ohio*, 426 U.S. 610, 617, 96 S.Ct. 2240, 2244, 49 L.Ed.2d 91 (1976), the Court recognized that an arrestee's silence after receipt of *Miranda* warnings may be nothing more than an exercise of the rights explained in the warnings and is thus, "insolubly ambiguous." The Court found it fundamentally unfair for the state to offer implicit assurances in the *Miranda* warnings and then use subsequent silence to impeach an accused's explanation at trial. The Court concluded that "the use for impeachment purposes of petitioners' silence, at the time of arrest and after receiving *Miranda* warnings, violated the Due Process Clause of the Fourteenth Amendment." *Id.* 426 U.S. at 619, 96 S.Ct. at 2245.

The Supreme Court refused to extend its holding in *Doyle* to use of an accused's pre-arrest, pre-*Miranda* silence. *Jenkins v. Anderson*, 447 U.S. 231, 238–240, 100 S.Ct. 2124, 2129–30, 65 L.Ed.2d 86 (1980) (impeachment by pre-arrest, pre-*Miranda* silence does not violate the Fifth or the Fourteenth Amendment). And, in *Fletcher v. Weir*, 455 U.S. 603, 102 S.Ct. 1309, 71 L.Ed.2d 490 (1982), the Court allowed the government in a murder case to use the defendant's post-arrest silence to impeach his claim that he acted in self-defense, when he had not received any *Miranda* warnings during the period in which he remained silent immediately after his arrest. *Jenkins, Fletcher,* and later holdings confirm that *Doyle* rests on the fundamental unfairness inherent in assuring a defendant that he may remain silent and then impeaching him with his silence at trial. *Greer v. Miller*, 483 U.S. 756, 763, 107 S.Ct.

---

1. Petitioner has filed no brief responding to the Wisconsin supreme court decision. The initial brief in support of the petition for a writ of habeas corpus consists primarily of a photocopied copy of the brief filed with the supreme court. Petitioner filed no reply brief to respondent's brief in opposition to the petition.

3102, 3107, 97 L.Ed.2d 618 (1987). "Thus, 'absen[t] the sort of affirmative assurances embodied in the *Miranda* warnings,' the Constitution does not prohibit the use of a defendant's postarrest silence to impeach him at trial." *Id.* (quoting *Fletcher,* 455 U.S. at 607, 102 S.Ct. at 1312).

◼ Neither the Supreme Court nor the Court of Appeals for the Seventh Circuit has addressed the precise question whether the state's reference to pre-*Miranda* silence in its case-in-chief violates the Fifth Amendment. *Fencl v. Abrahamson,* 841 F.2d 760, 766 (7th Cir.1988). It is clear, however, that only a person subjected to custodial interrogation is entitled to the Fifth Amendment protections embodied in the *Miranda* warnings. *See Berkemer v. McCarty,* 468 U.S. 420, 434, 104 S.Ct. 3138, 3147, 82 L.Ed.2d 317 (1984). A person questioned during a routine traffic stop, for instance, is not "in custody" and *Miranda* warnings are not required. *Id.* 468 U.S. at 442, 104 S.Ct. at 3151.

◼ I turn now to the challenged references to petitioner's silence in this case. I agree with the Wisconsin supreme court that it was constitutionally permissible for the state to refer to petitioner's pre-*Miranda* silence when cross-examining him. *Jenkins,* 447 U.S. at 238–240, 100 S.Ct. at 2129–2130; *Fletcher,* 455 U.S. at 607, 102 S.Ct. at 1312. I agree also that the state's references to petitioner's pre-*Miranda* silence during its case-in-chief did not violate the Fifth or Fourteenth Amendment. Petitioner's encounters with Schlesselman and Zeller were not the type of coercive or custodial situations that invoke the need for Fifth Amendment protection. *See Berkemer,* 468 U.S. at 434, 104 S.Ct. at 3147. Schlesselman is not a police officer and gave petitioner a ride to a nearby town at petitioner's request. Although Zeller is an officer, his conversation with petitioner was even less coercive than an ordinary traffic stop and did not implicate petitioner's right to silence. The testimony elicited from Deputy Bratner, the arresting officer, made no reference to petitioner's silence.

◼ The questioning of Officer Papke requires a different analysis. The state asked Papke specifically about petitioner's failure to explain the shooting incident after his arrest while he was in custody. However, this inquiry was in response to questions posed by petitioner's counsel. On cross-examination of Papke, petitioner's counsel asked whether petitioner had stated that "it was a big mistake" and "he wanted to talk to someone." Petitioner's counsel also asked whether petitioner had ever explained to Papke what he meant by "big mistake." These questions opened the door to the state's further inquiry about the extent of petitioner's remarks to Papke. *See United States v. Robinson,* 485 U.S. 25, 34, 108 S.Ct. 864, 870, 99 L.Ed.2d 23 (1988) (no Fifth Amendment violation to refer to defendant's silence in fair response to remarks made by defense counsel). The questioning of Papke on redirect examination did not violate petitioner's constitutional rights.

◼ However, the situation is different with respect to the state's references to petitioner's post-*Miranda* silence during its cross-examination of petitioner and in closing argument. These references constitute due process violations under *Doyle.* The clear implication of the state's repeated remarks was that petitioner's failure to explain the accidental nature of the shooting prior to trial evidenced his guilt. The Wisconsin supreme court recognized that the references were a violation of the Constitution, but found them to be harmless. I cannot agree.

◼ Whether a constitutional error is harmless is a question of federal law. It is not subject to the presumption of correctness given to the state court's findings of fact. *Savory,* 832 F.2d at 1018; *see United States v. Flannigan,* 884 F.2d 945, 950–51 (7th Cir.1989) (federal court not bound by state court's ruling that constitutional error is harmless). "Constitutional error is reversible error unless it is harmless beyond a reasonable doubt." *United States v. Shue,* 766 F.2d 1122, 1132 (7th Cir.1985) (citing *Harrington v. California,* 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969) and *Chapman v. California,* 386 U.S. 18,

87 S.Ct. 824, 17 L.Ed.2d 705 (1967)). A district court must determine whether a reasonable possibility exists that the errors complained of might have contributed to the defendant's conviction. *Savory,* 832 F.2d at 1019. The question becomes "whether absent the constitutionally-forbidden evidence, honest and fair-minded jurors might very well have brought in not-guilty verdicts." *Burns v. Clusen,* 798 F.2d 931, 943 (7th Cir.1986) (citing *Chapman,* 386 U.S. at 24, 87 S.Ct. at 828).

█ Respondent has the burden of proving a constitutional error harmless. *Fencl,* 841 F.2d at 768. In most cases, the Court of Appeals for the Seventh Circuit requires that the other evidence of guilt be "overwhelming" before concluding that a constitutional error was harmless. *Savory,* 832 F.2d at 1020; *Dudley v. Duckworth,* 854 F.2d 967, 972 (7th Cir.1988) (error not harmless where evidence of guilt was impressive, but not overwhelming).

In this case, there were at least four occasions during cross-examination and closing argument on which the state made reference to petitioner's failure to explain the accidental nature of the shooting at any time before trial. The Supreme Court of Wisconsin concluded that "the infrequency of the references in the context of the entire trial mitigated any possible prejudicial effect on the jury." *Brecht,* 143 Wis.2d at 318, 421 N.W.2d at 104.

It is true that the references are not extensive and the trial transcript is lengthy, but the state's references to petitioner's post-*Miranda* silence are crucial. Petitioner admitted shooting Hartman. The sole issue for the jury was whether the shooting was accidental or intentional. With the defense hinging on petitioner's credibility, the state's remarks that he simply concocted a "crazy story" at the time of trial may have been determinative.

Moreover, the state's circumstantial evidence that petitioner intended to shoot Hartman falls short of overwhelming. Although Hartman told several people that petitioner had shot him in the back, he also indicated that he knew of no reason why petitioner would shoot him intentionally.

Petitioner did not call for help for Hartman and fled in Hartman's car, but this evidence is as consistent with a panic-stricken reaction to a horrible accident as it is with an intentional homicide. Police officers found nothing at the scene that could have tripped petitioner, but both petitioner and Molly Hartman testified to petitioner's foot injury and even non-injured people have been known to trip for no apparent reason. In addition, there is virtually no evidence of motive. In his brief, respondent suggests that "the most probable motive for the murder was the petitioner's desire to raise money for his homosexual friend Darrell Mason and to obtain his freedom so he could return to Georgia to be with him." It is questionable whether the record supports the proposition that petitioner wanted to leave Wisconsin. Even if it did, this says nothing about petitioner's motive for murdering his brother-in-law. Finally, respondent points to the evidence that the bullet entered Hartman at a horizontal trajectory. This evidence may be inconsistent with petitioner's claim that the shooting was an accident, but it is not conclusive. A rational jury could have believed petitioner's story and reconciled the supposed inconsistencies. *Shue,* 766 F.2d at 1133.

Because the state's effort to present petitioner's story as a recent fabrication by referring to his post-*Miranda* silence may have influenced the verdict, I conclude that respondent has not met his burden of proving that the use of petitioner's post-*Miranda* silence constitutes harmless error. Accordingly, I will grant the petition for a writ of habeas corpus. For the sake of completeness, I will address petitioner's other claims.

*Evidentiary Rulings*

█ Petitioner contends that the trial court's evidentiary rulings involving his homosexuality and the testimony of his probation officer violated his due process rights. The admissibility of evidence in a state criminal trial is generally a matter of state law. *Flannigan,* 884 F.2d at 953. A district court can issue a writ of habeas corpus only when an erroneous state evidentiary ruling "is of such magnitude that

the result is a denial of fundamental fairness" and consequently, a denial of due process. *Dudley*, 854 F.2d at 970. In deciding whether a writ should issue, a court must determine whether the probative value of the evidence is greatly outweighed by its prejudicial effect on the accused. *Flannigan*, 884 F.2d at 953.

Respondent contends that the evidence of petitioner's homosexuality was relevant to the issue of motive. In response to petitioner's motion in limine on this issue, the state represented to the trial court that it would provide evidence that Hartman disapproved of petitioner's sexual preference and made that known to him. At trial the state's evidence was that Hartman discussed petitioner's homosexuality with him on several occasions, did not understand or accept petitioner's homosexuality and restricted him from engaging in homosexual relationships while staying with the Hartmans. Discussing a person's sexual preference and setting restrictions on that person's behavior while staying in one's home are not equivalent to communicating disapproval or condemnation to that person. The state's evidence might be relevant to a possible motive if there was any evidence to indicate that petitioner and Hartman had argued about the restrictions or about petitioner's sexuality. There was none. Molly Hartman testified specifically that her husband never indicated his feelings about petitioner's sexuality in her presence and that she was not aware of any disagreements between petitioner and Hartman.

Respondent argues also that evidence of petitioner's homosexuality was relevant to his motivation for returning to Georgia to help his friend, Darrell Mason. Although respondent asserts that petitioner's counsel admitted that at least one letter petitioner composed to Mason had "homosexual overtones," there is no proof in the record that petitioner's relationship with Mason was sexual. Even assuming such a relationship, it is difficult to connect petitioner's alleged desire to return to Georgia with a motive for murdering Hartman.

I conclude that the evidence of petitioner's homosexuality was not relevant to any purported motive petitioner had to shoot his brother-in-law. Other courts have recognized that "evidence of homosexuality is extremely prejudicial" in a criminal trial and that even a limiting instruction to the jury is "not sufficient to obviate the prejudice." *United States v. Gillespie*, 852 F.2d 475, 479 (9th Cir.1988).

The question remains whether the erroneous admission of evidence about petitioner's homosexuality was of the magnitude to deny petitioner a fundamentally fair trial. Standing alone, the prejudicial effect might not constitute a denial of due process. However, the trial court also erred in ruling that evidence of worthless check violations would be admissible if petitioner called his probation officer to testify to his non-violent character. As the Wisconsin supreme court noted, Wis.Stat. § 904.04(1)(a) limits the state's introduction of character evidence to that which rebuts the character trait of non-violence. *Brecht*, 143 Wis.2d at 322, 421 N.W.2d at 106. The court held that because petitioner's "worthless check convictions are completely unrelated to the character trait of non-violence, the circuit court's ruling was in error." *Id.* at 323, 421 N.W.2d at 106.

Other than petitioner's own testimony and brief testimony by an officer who observed petitioner after he was arrested and in jail custody, the probation officer's testimony was to be the only testimony offered for the defense. Evidence that petitioner was non-violent is directly relevant to the central issue whether the shooting was accidental or intentional. The combined errors of allowing prejudicial evidence of petitioner's homosexuality and effectively excluding testimony on his non-violent character are significant in a case lacking overwhelming evidence of guilt. Accordingly, I conclude that petitioner would be entitled to a writ of habeas corpus based on his claim that evidentiary rulings denied him due process.

*Ex Parte Trial Brief*

Finally, petitioner contends that the trial court's acceptance of the state's ex parte brief constitutes a denial of due process. Petitioner argues that through its brief,

the state improperly tried to persuade the court of petitioner's guilt before trial. However, petitioner stipulated to the submission of ex parte briefs and filed his own with the court. I agree with the Wisconsin supreme court that nothing challenged in the state's ex parte brief denied petitioner a fundamentally fair trial. *Brecht*, 143 Wis.2d at 323, 421 N.W.2d at 106. Accordingly, I conclude that petitioner is not entitled to a writ of habeas corpus on the ground that the state's ex parte trial brief violated his right to due process.

### ORDER

IT IS ORDERED that petitioner's petition for a writ of habeas corpus is GRANTED on the grounds that petitioner's right of due process was violated by the state's improper references to petitioner's post-*Miranda* silence and the trial court's erroneous evidentiary rulings. On all other grounds, the petition is DENIED.

Execution of the writ of habeas corpus will be stayed for sixty (60) days from the date of this order to permit the state to provide petitioner a new trial. If petitioner is not provided a new trial within that time, the writ will issue.